AO 91 (Rev. 5/85) Criminal Complaint

RECEIVED

# UNITED STATES DISTRICT COURT

2013 DEC 11  AM 9: 14

### SOUTHERN DISTRICT OF IOWA

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA

v.

MO HAILONG,
also known as, ROBERT MO,

Defendant.

**CRIMINAL COMPLAINT**

CASE NUMBER: 4:13-MJ-267

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  From on or about September of 2011, and continuing until on or about October of 2012, in Polk County, in the Southern District of Iowa, the defendant, MO HAILONG, also known as, ROBERT MO, did violate Title 18, United States Code § 1832 (theft of trade secrets).

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this Complaint is based on the following facts:

See Affidavit attached and incorporated

Continued on the attached sheet and made a part hereof:     ☒ Yes    ☐ No

_____
Special Agent Stephanie Post
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

_12/10/13   5:40 pm_____    at    _Des Moines, Iowa_____
**Date**                                                          **City and State**

_____
Ross A. Walters, U.S. Magistrate Judge
**Name & Title of Judicial Officer**

_____
**Signature of Judicial Officer**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | Case No. 4:13-mj-267 |
| OF THE UNITED STATES OF AMERICA ) | |
| FOR THE ISSUANCE OF A CRIMINAL ) | UNDER SEAL |
| COMPLAINT AGAINST MO HAILONG, ) | |
| ALSO KNOWN AS, ROBERT MO, ) | |

**AFFIDAVIT**

I, Special Agent Mark E. Betten , being duly sworn, depose and state as follows:

The information contained in this affidavit is provided solely for the purpose of establishing probable cause for the issuance of a Complaint.

I believe that there is probable cause to show violations of 18 USC 1832 (theft of intellectual property).

In support of this application, the following information is provided:

1.     I am a Special Agent of the Federal Bureau of Investigation, assigned to the Omaha Division, Des Moines Resident Agency.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18 USC Section 3052. I have been a Special Agent of the FBI for approximately 16 years and have been assigned to the Omaha Division since 2000.  Prior to joining the FBI I served eight years in the United States Military.  I have received specialized training in the identification and investigation of theft of intellectual property and interstate transportation of stolen property.  I am fully familiar with the facts of the case.  The facts set forth in this affidavit are based on my participation in the investigation described below and discussions with other law enforcement personnel involved in

1

the investigation.  The information contained in this affidavit is solely provided for the purpose of establishing probable cause for the issuance of arrest warrants, search warrants for the premises described above, and seizure warrants, and thus does not contain every fact known to me about this investigation.

2.     The FBI has been conducting an investigation of theft of trade secrets of bio-engineered corn seed by various subjects since September 2011.  The investigation has focused primarily on Mo Hailong "Robert".  Mo is a Chinese national who became a Lawful Permanent Resident (LPR) in the United States pursuant to an H-1B visa.  He is ostensibly employed as the Director of International Business of the Beijing Dabeinong Technology Group Company, which is part of DBN Group.  DBN Group is believed to be a Chinese conglomerate with a corn seed subsidiary company, Kings Nower Seed.  To summarize, and described in detail below, there is probable cause to believe that Mo and co-conspirators are engaging in criminal activity to steal the intellectual property of U.S. based seed manufacturing companies and transporting that stolen intellectual property back to China for the benefit of their China-based seed company.

3.     In addition to Mo and his overseas co-conspirators, the FBI's investigation is focusing on several potential "insiders" at U.S. based seed companies.  These insider employees are suspected of conspiring with Mo to provide the locations of test fields being utilized to grow bio-engineered seed and/or providing the underlying gene sequences for bio-engineered seed developed by the victim companies.

4.     On 6/30/2011, FBI agents assigned to the Des Moines, Iowa office conducted a routine liaison visit to Pioneer Hi-Bred Corporation located in Johnston, Iowa.  During that visit, Pioneer security officials advised the agents of a suspicious incident on May 2 and 3, 2011 in one

2

of its grower's test fields near Tama, Iowa. (Pioneer contracts with private growers to grow a variety of proprietary "inbred" or "parent" test seed. This inbred test seed is considered by Pioneer to be extremely valuable and intellectual property of Pioneer. They take reasonable steps to protect its development and consider it a "trade secret").

5.     On 5/2/2011, Mo and Wang Lei, the Vice Chairman of Kings Nower Seed (the corn seed subsidiary company of DBN Group in Beijing), approached the grower of the Pioneer test field and asked what he was planting in his field. The grower replied seed corn. According to the grower, one of the Asian males said that they had been attending an agriculture conference in Ames, Iowa.

6.     The following day on 5/3/2011, a Pioneer field manager saw Mo on his knees in the same grower's field, which had just been planted within the previous two days, and another Asian male sitting in a nearby car. The field manager confronted Mo in the field and asked what he was doing. Mo said he worked for the University of Iowa and the other individual in the car was from China. Mo explained that they were going to attend a conference in Ames or Des Moines (the field manager could not remember which location Mo stated). When the field manager received a telephone call, Mo and the Asian male quickly departed the area, driving down through the ditch in order to leave quickly. The field manager described Mo as being very nervous and his face was flushed. The field manager stated the other Asian male (Wei) was the driver of the car. The field manager obtained the license plate which Pioneer security personnel used to trace back to a rental car company at the Kansas City airport and rented by Mo Hailong residing in Miami, Florida. FBI agents have subsequently confirmed that there were no USDA or Iowa State University agriculture related conferences being hosted during the time period,

3

indicating Mo's statement to the farmer and the field manager were both false. The grower's field was not marked with any identifying information indicating it was a test field for Pioneer Hi-Bred and the field is in a very remote and rural area of Iowa—not immediately off a well-traveled route of travel. An Omaha Division FBI agent confirmed with Pioneer officials that this particular field was growing one of their two or three most highly-anticipated inbred corn seed products they expected to bring to market within the next several years. Pioneer officials confirmed that the theft of that product would result in an extremely significant economic loss to the company. Mo rented the car on 4/22/2011 and returned it on 5/6/2011. It appears he utilized it the entire time and traveled extensively through Midwestern "farm belt" states during that period of time.

7.     On 9/6/2011, the Polk County Sheriff's Office responded to a report of Asian males acting suspiciously near a farm field in Bondurant, Iowa. When the deputy responded, he identified Mo Hailong "Robert", Wang Lei, and Li Shaoming (The FBI believes Li Shaoming is a PhD scientist and CEO for Kings Nower Seed, DBN's seed subsidiary in Beijing). When the deputy asked what they were doing, Mo explained that the other two individuals were from China, that they had flown into Chicago, and that they were driving across the Midwest looking at crops. Mo expressed surprise that a law enforcement officer would respond and question them because in China, the farmers welcome their assistance. Mo, Wang, and Li then departed the area. An Omaha Division FBI agent has since interviewed the owner of the farm field. The owner stated he is a contract grower for Monsanto. Monsanto, based in St Louis, is a major producer of bio-engineered corn seed in the United States. The owner did not know what type of seed is being grown because Monsanto deliberately keeps that information private to protect the

product from competitors. The same FBI agent interviewed the Monsanto field representative for the particular field who confirmed it was being utilized to grow inbred test seed for Monsanto. The field in question was unmarked and was several miles and turns off interstate 80 in Bondurant, Iowa. It is highly unlikely anyone would drive by the location if traveling to or from the Chicago area. The FBI believes that MO was utilizing a rental car during this trip as well.

8.     On 9/27/2011, MO mailed 15 packages ranging in weight from 13 to 40 pounds each from a UPS Store in West Des Moines, Iowa, to himself at his home address of 22130 Candle Court Boca Raton, FL. MO listed the contents as "corn samples." The total weight was 341.27 pounds and the total shipping charge was $1,152.97. The FBI does not know what MO did with these samples after receiving them at his residence.

9.     In general, the intellectual property of a seed producer is their "inbred" or "parent" line of seed versus a hybrid variety. Inbred seeds are developed by the scientists of a seed company that has a particular trait, e.g. glyphosate (round-up) resistance, in order to cross breed that inbred seed with another inbred line of seed having a desired trait to develop a hybrid line of seed. Seed companies spend significant money in research and testing costs to develop successful inbred lines of seed in order to develop hybrid seed. An individual wishing to steal an inbred line of seed can either obtain the seed in seed form, i.e. either straight from the bag or shortly after its been planted and before germination (such as digging in the field as MO was doing), or the seed can be obtained from grown ears during the harvest season when grown by contract growers. An inbred line of seed is "pure" and can continue to be replanted every season, whereas a regular hybrid seed cannot continue to be planted in subsequent years.

10.     In early February 2012, the FBI received information that Mo and Wang would be meeting at O'Hare airport on 2/14/2012 and flying on to Des Moines that evening to take part in the activities surrounding the visit by the Vice President of China on 2/15 – 2/16/2012.  The FBI initiated surveillance at the Des Moines airport on the evening of 2/14/2012 and confirmed that Wang arrived in Des Moines and boarded a bus with a large number of other Asian individuals. The bus transported the group to a hotel in Urbandale, Iowa.  Mo was not observed.  It was confirmed the following morning that Wang was a registered guest, but there was no registration for Mo.

11.     During the morning of 2/15/2012, Pioneer security notified the FBI that they were confident that Mo was at their headquarters on a tour with a large group of Asian visitors. Pioneer reported that Mo signed into their facility using an alias name of Hougang Wu, Chairman of Dalian Zhangzidao Fishery Group.  Pioneer security confirmed that Mo was wearing a name tag with the alias.  A FBI surveillance team acquired surveillance of Mo several hours later taking part in a tour of a Monsanto research facility in Ankeny, Iowa.  Later that evening, Mo attended the state dinner hosted by the Iowa Governor for the VP of China.

12.     The following morning on 2/16/2012, Mo attended an agriculture symposium at the World Food Prize in Des Moines and surveillance confirmed he again used the alias Hougang Wu during that event.  Later in the afternoon, Mo and Wang met with Xaoming Bao, a Chinese seed executive and former Pioneer employee, at a sports bar restaurant near the Urbandale hotel where both Wang and Mo were staying.  Bao's spouse is currently an active Pioneer employee, working as a corn geneticist researcher.  After attending another event in the evening at the World Food Prize building, Mo returned to the hotel in Urbandale for the evening.

6

The following morning, Mo departed the hotel sometime between 8:00 a.m. and 9:30 a.m.  A rental car company at O'Hare airport confirmed Mo returned a car later that day.

13.     On or about 4/20/2012, Mo flew from Florida to the Chicago area and obtained a rental car.  FBI surveillance teams initiated physical surveillance of MO on or about 4/24/2012. Surveillance teams observed MO spending the majority of his time driving slowly through rural farmland areas of Illinois and Northern Indiana.  On 4/26/2012, FBI surveillance observed MO stopped at a farm near Monee, Illinois advertising Pioneer seed products.  A subsequent interview of the landowner of the farm revealed that MO had stopped and was asking about various types of corn and soybean seed, explaining that he had purchased 40 acres of land nearby and was going to plant on the property.  The landowner tried to obtain some personal information from MO, thinking MO may be a potential future customer, but MO would not disclose any information about himself.  MO departed without purchasing any products.

14.     Later the same day of 4/26/2012, FBI surveillance observed MO spending time at a nearby farm located at 26138 South 104th Avenue, Monee, IL.  Subsequent investigation by the FBI revealed this parcel of land was purchased by Kings Nower Seed in March 2012 for approximately $600,000.

15.     On 4/28/2012, FBI surveillance observed MO traveling to Adel, Iowa.  FBI agents conducting the surveillance reported that MO was taking what the agents considered to be deliberate counter-surveillance activity, such as driving slowly on the interstate for prolonged periods of time followed by short bursts of high speed driving.  Most significantly, once MO arrived in Adel, Iowa, he made several u-turns and backed in to parking lots immediately off the main road so he could apparently observe any traffic.  (The FBI subsequently learned, described

in further detail below, that MO is the renter of a storage facility in the immediate vicinity of this u-turn activity).

16.     On 4/30/2012, FBI surveillance teams observed MO stop at Crossroads Ag, a Pioneer seed dealer in Dallas Center, Iowa (approximately 15 miles west of Des Moines). MO was observed loading bags of seed into the back of his rental vehicle. A subsequent interview of the store owner revealed MO purchased six bags of Pioneer Hi-Bred corn seed for $1533.72 cash. The owner explained MO has purchased seed in a similar manner the last two years as well, that he always pays cash, and is always evasive when asked direct questions about what he does with the seed. The store owner explained in years past, MO always asked for Pioneer's "latest products," but this year he came in with a list of seed products he was interested in. The store owner explained that Pioneer would not be happy if they learned MO was purchasing seed in such a manner because seed dealers, pursuant to their contract with the company, may only sell seed to farmers they know have signed a growing agreement, binding them to the terms of utilizing the seed. The store owner explained MO has never signed such an agreement and the store owner should not sell it to him.

17.     On 5/1/2012, FBI surveillance teams initiated surveillance of MO in the Des Moines, Iowa area. Surveillance teams observed him drive to MFA Agri Services located in Pattonsburg, Missouri (approximately 120 miles from Des Moines). Subsequent investigation by the FBI determined MO purchased six bags of DeKalb ("DeKalb" is a corn seed trade name owned by Monsanto) for $1,366.00 cash. An interview of the store owner explained MO has bought seed in a similar fashion for three years, always pays cash, and is always very vague about what he does with it. There are numerous Monsanto and Dekalb dealers within a twenty-

8

mile radius of Des Moines. After MO purchased these six bags of seed, he returned to the Adel, Iowa area where he was observed loading and unloading items from his rental vehicle into a local storage facility. The storage locker facility was in the immediate area of where MO was observed the previous Saturday conducting u-turns and backing in to parking lots to apparently observe traffic. An FBI agent from the Omaha Division interviewed the storage locker owner. The owner confirmed that unit 48 was rented by an individual using the name "Mo Hailong." Unit 48 was confirmed to be in the immediate area where MO was observed unloading the bags.

18.     After MO finished at the storage locker, he drove straight back to the farm in Monee, Illinois purchased by Kings Nower Seed. Surveillance teams observed him unloading what appeared to be bags of seed from the rental vehicle into a storage shed on the property.

19.     On 5/2/2012, FBI surveillance teams observed MO being accompanied in the rental vehicle by two Asian males, subsequently identified during a traffic stop by local police as YE Jian, and LIN Young, both PRC nationals and employees of DBN / Kings Nower Seed. Department of State visa records revealed that YE stated he worked for Kings Nower Seed Company and was going to Iowa to attend meetings. FBI surveillance teams observed MO and YE together daily during the time YE visited the United States. At no time, did surveillance teams observe YE visit the state of Iowa (although there was a period of approximately 24 hours where surveillance was broken off in the area of Davenport, Iowa but the FBI believes MO and YE continued to the Galesburg, Illinois area given their last known direction of travel.)

20.     During the time YE was in the country with MO, they spent the majority of their time driving slowly through rural farm areas of primarily Illinois and some limited time in Indiana. They also spent considerable time at the farm owned by Kings Nower Seed near

Monee, Illinois.

21.     On 5/11/2012, FBI surveillance teams observed MO, YE, and LIN arrive in the rental car at a local FEDEX shipping location in Orland Park, Illinois.  MO, assisted by YE and LIN, unloaded five boxes and dropped them off.  A FBI employee went in the store after MO departed and the store clerk allowed the FBI employee to examine the packages.  There were five boxes, each twenty-five pounds, addressed to an individual in Hong Kong.  On the label, the contents were listed as "corn seed."  The FBI believes since MO purchased approximately 500 lbs. of seed while in Missouri and Iowa, he attempted to ship approximately half of it while possibly planting or storing the other half at the farm in Monee, further described below.  Both YE and MO departed the Chicago area from O'Hare airport on 5/15/2012.  During a routine border crossing search of YE's checked luggage, no items of evidentiary value were located.

22.     On 5/14/2012, Memphis FBI agents obtained court-authorization to conduct a search of the five boxes of seed shipped via FedEx.  Contained in each box was approximately eight or nine gallon sized baggies full of corn seed.  There were 42 bags total.  Each bag had a piece of paper in it with a handwritten number such as 1203, 1210, 1213, etc.  These numbers do not correspond to any product IDs of commercial seed products that the FBI could determine.  Your affiant believes these generic handwritten numbers were utilized to obscure and conceal the manufacturer and origin of the seed, but that MO and his co-conspirators have a "key" that would identify the products.

23.     FBI agents have conducted interviews of Stine Seed executives and Pioneer executives about intellectual property concerns of a competitor purchasing regular hybrid seed corn from a seed dealer.  Each company's executives, independent of one another, explained that

in a regular bag of hybrid seed corn, approximately one half of one percent of that bag will contain the "pure inbred" seed used to create that hybrid. Knowledgeable individuals in the seed industry would know this fact and there are a variety of methods someone intent on stealing the intellectual property, contained in the inbred seed, could utilize to steal this seed. One of the methods is testing in a laboratory, or a more simple method would be to plant the bag of seed corn and after the seed begins to germinate and grow, an inbred plant can be distinguished through its characteristics. This plant can then be isolated and the inbred seed harvested. Seed companies take reasonable steps to protect against this possibility by requiring their dealers to sell seed only to farmers who have signed a grower agreement, agreeing not to do this activity. The Pioneer China country manager, who is a Vice President for Pioneer, advised the FBI that one of DBN's best-selling corn seed products in China utilizes a male parent (inbred) line of seed that Pioneer determined their company developed. The Pioneer VP confronted a DBN executive on this fact, somewhat sarcastically congratulating the DBN official on the success of the product since it utilized a Pioneer-developed genetic trait, and the DBN official smiled and nodded, implicating acknowledging to the Pioneer VP the truth of the accusation. Pioneer executives estimated that the loss of an inbred line of seed would result in losing approximately 5-8 years of research and a minimum of $30-40 million dollars, potentially much more, if the product is very successful.

24.     On 8/15/2012, FBI agents assigned to O'Hare airport learned that YE would be arriving on 8/18/2012. FBI surveillance observed YE being picked up at the O'Hare airport by Eugene YU, Chinese-American real estate realtor in the Chicago area. Over the next several days, surveillance observed YE and YU spending much of their time at the farm in Monee,

Illinois as well as taking part in sight-seeing activities in downtown Chicago.

25.     On 8/22/2012, FBI agents assigned to O'Hare airport learned that LI (the CEO of Kings Nower) would be arriving on a flight in to O'Hare on 8/25/2012.

26.     On 8/28/2012, FBI agents learned, through court-authorized surveillance on YE's cellular telephone, that YE and YU discussed renting a storage locker at Infinite Self-Storage in New Lenox, Illinois.  YU and YE discussed finding a storage location in a location that would not attract attention.  FBI agents believed YE would likely utilize this locker to store corn samples either stolen or collected during his activity in the United States.

27.     On 8/29/2012, FBI agents obtained court authorization to install a GPS tracking device and an audio listening device in an Enterprise rental car being rented by LIN and utilized by him and YE.  During the time period of 8/29/2012 to 9/5/2012 when LIN returned the rental vehicle, the GPS tracking device showed the vehicle spending significant time in rural areas of North Central Illinois, and making stops in areas that appeared to be farm fields.  The listening device in the car, which was activated when LIN and YE picked up the car on 8/25/2012 at approximately 5:25 p.m. and expired at approximately 5:25 a.m. on 9/4/2012, corroborated this activity.  The recording device recorded numerous occasions wherein YE and LIN were identifying "parent" fields belonging to Pioneer and Monsanto and then stopping to get out and steal ears of corn to bring back to the car in order to tag and categorize them.  During the recording, YE and LIN discuss the direction they receive from LI (the Kings Nower CEO) and the activity of MO, LI, and WANG in the past collecting samples, including when they were confronted (the FBI believes YE and LIN are referring to either the incident in the Pioneer grower field in May 2011 or the Bondurant field in September 2011).  Also on the recording is a

discussion about their knowledge of their illegal activity.   An excerpt of this conversation is as follows:

YE:       You can forget about ever coming to the U.S. again, assuming things go wrong. You can never come. Isn't that ruining an individual's future?

LIN:      If it's just not being able to come to the U.S. again –

YE:       That's no biggie.

LIN:      - that's no biggie. I don't think it's that simple. I actually, the law in the U.S – I studied law!

YE:       Oh yeah, you practiced law.

LIN:      These are actually very serious offenses. You, you -

YE:       They could treat us as spies!

LIN:      That is what we've been doing! What I am trying to say is, as for the charges, there could be several -

YE:       Yeah.

LIN:      It's e-hum, trespassing other people's private property, that's one; secondly, theft/larceny; and the third, violation of IP law. That's three charges.

YE:       That's right.

LIN:      All criminal offenses…not just blocking us from visiting. This, e-hum, Dr.
LI, he -

YE:       ….hasn't he considered these?

LIN:      ….he actually knows clearly, he knows.

YE:       He should.

LIN:      He actually has done some research on such subjects, he said that to me. He's  studied all sorts of things. According to himself, he has positioned himself when he was twenty-five or twenty-six years old as ZHU Geliang [a military counselor from an ancient Chinese novel], a counselor type of

13

person who helps others on an entrepreneurial effort but not an entrepreneur type of person himself…so he learned different professional skills. When he started to work for DBN, he was the VP of the financial aspects, what major you would think he studied?

YE:     Wow so good…

LIN:    When the seed operation was launched, he was in charge of the legal side, and at the time I am the person who studied law, and logically [UI]. So he has the knowledge of all aspects, he really understands.

YE:     That's right. This is an adventure. Actually, I e-hum, that person has told
me –

LIN:    Actually I rather not think…

YE:     - actually, the person, before I came, told me that what you guys are doing is troublesome. Risky.

LIN:    Is it Lao MO? ("Lao" is a term for a senior or "teacher"  The FBI believes LIN is referring to Mo Hailong)

YE:     No. [UI] [mumbled a name], my other half.

LIN:    My family just has no clue what I am doing here. My Oldman asked me what you guys are doing staying in the U.S. for so long?  What can I say? Can't say anything.

YE:     Can't say anything that will make your family worry about you.

LIN:    Right!  He also said that, when you are in the U.S., you can't even speak well –

YE:     [Laughs]

LIN:    - for such a long time, what are you going to do?  Yeah, when I think about it,  what he said make sense. So if we were to get in trouble, it's going to be much more than just not being able to come to U.S. again…that's the least to worry about. Either way. I don't really want to come to the U.S. anyway.

YE:     Right.

LIN:    But that, is trouble.

YE:          So [sigh]. The company can't afford the legal cost.

LIN:         How could they? No, they can't afford the indemnity, and we individuals
             take huge risks too. See these are private properties, entering without
             permissions is considered a criminal offense…

YE:          Right,

LIN:         But that also depends on the consequences. Taking things from the
             property is    theft. When the number of stolen goods reaches a certain
             amount, this becomes IP violation. Nowadays the U.S. is very hostile to
             China on this matter. If this time they opt to -

YE:          [Deep sigh]

LIN:         - if they max the punishment, then we are done. I can't think of this,
             whenever I think about these, I just can't do anything.  But I mentioned it
             to Dr. LI that I don't agree on running this project for such a long time.

YE:          The longer the time is, the more likely we get in trouble.

LIN:         Exactly! That's just so unnecessary! All we got this year are male parents,
             why? The male parents are subspecies [sic]…. and I figure that more than
             half of that are duplicates.

YE:          Very likely they are duplicates.

LIN:         The hybrids are probably from a second cycle line when we get back [to
             China]  too, I figure, we'll see. If we really have to, we can come next year
             and just dig!    My point is that the outcome doesn't justify the effort we
             put in! We take such a  huge risk, for such a long time, just to get some
             duplicates. From decision-making  standpoint, I think it's not [UI]. Dr.
             LI's personality tends to go extreme…

YE:          Yeah, apparently.

28.    On 9/11/2012, FBI agents in Des Moines, Iowa observed via a stationary pole
camera, three Asian males arrive in what appeared to be a Silver Dodge Journey at the storage
locker near Adel, Iowa (the same storage locker MO was observed at in April and May 2012).

The three males were observed loading and unloading items in to the locker. Due to the quality of the video and the angle of the car (that did not have a front license plate), the agents observing the video were unable to identify the car or its occupants. They spent approximately twenty minutes at the location.

29.     On 9/23/2012, the same vehicle, believed to be a Dodge Journey, possibly with a Michigan license plate, was observed via the pole camera back at the storage locker near Adel, Iowa. During this visit, for approximately one hour, two Asian males were observed loading and unloading items in to the storage facility. After this second visit, FBI personnel in Omaha and Chicago began efforts to identify the occupants of the suspected Dodge Journey.

30.     On 9/26/2012, FBI surveillance in the Chicago Division observed YE and LI in a Silver Dodge journey, with Michigan license plates. They were observed at the Infinite Self-Storage facility in New Lenox, Illinois. Surveillance agents conducted a walk-by of the storage unit and observed many individual ears of corn along with packaging materials. It appeared both YE and LI were in the locker packing materials.

31.     The FBI interviewed the storage locker manager. The manager stated that the locker was rented by Eugene YU on 8/31/2012 and he was accompanied by two Asian males. The storage manager stated that YU wanted to rent the locker in the name of the company but would not provide the company's name. Ultimately YU provided his own name and paid cash for a three-month rental.

32.     On 9/27/2012, the storage manager confronted YE and LI who were at the storage locker. According to the storage manager, on the previous Tuesday, he observed YE and LI in the locker with hundreds of ears of corn and told them they could not store perishables and food

16

items because it attracted rodents.  The manager told them they had until Thursday to remove all

the corn.  When YE and LI appeared to fail to understand English, the manager called YU and

instructed him to remove the corn by Thursday.  When the manager confronted YE and LI, they

were placing corn into individual bags and that they had hundreds of individual ears placed on

shelves in the locker that they had installed.

33.     On 9/28/2012 at approximately 9:00 a.m., FBI surveillance observed the storage

manager arrive and immediately go to the locker to inspect it.  Shortly later YE and LI loaded the

Silver Journey full of material from the storage locker and transported it to the farm in Monee

where FBI surveillance observed them appearing to unload it at that location.

34.     FBI agents received information that MO would be arriving at O'Hare airport on

the evening of 9/28/2012.  FBI agents received court authorization to place a listening device in

MO's rental car, a Ford Escape.

35.     On 9/29/2012, FBI surveillance observed multiple vehicles at the farm location in

Monee.  In addition to the Dodge Journey, a vehicle belonging to YU was present, and a

Chevrolet Malibu with a Michigan license plate.  A check of the plate confirmed the car

belonged to Enterprise Rental Car.  Enterprise personnel advised the car was rented by an

individual named Wang Hongwei (hereafter referred to as "HONGWEI" so as not to confuse

with Wang Lei referenced earlier during the suspicious incidents in the Iowa fields as the

surveillance at the Des Moines airport in February 2012).  HONGWEI entered the United States

by a land border crossing from Canada on 9/28/2012.  Later in the morning, MO arrived in the

White Ford Escape.  Surveillance observed at least five individuals, believed by the FBI to be

MO, LI, YE, HONGWEI, and YU moving multiple boxes between the vehicles and the garage

17

of the farm.  Later in the afternoon, all five of the individuals departed to eat together at a local restaurant.  One unknown individual in a mini-van remained at the farm location.  Surveillance personnel were unable to identify this individual.

36.    On the evening of 9/29/2012, YE was observed by surveillance returning the Dodge Journey to the Enterprise rental location near O'Hare airport.  After the car was returned, an FBI agent, with the consent of Enterprise personnel, collected refuse left behind in the car.  The Enterprise representative found a plastic bag in the rear passenger door that was considered to be refuse left behind by YE.  The plastic bag contained Scotch tape, Verizon Wireless brand replacement ear cushions, a plastic subway bag with what appeared to be corn kernels, dirt, and debris from a corn cob, and one rubber band, a napkin with 9-5 - 9-13:213, 9-19 - 9-22:106, and 9-14 - 9-18:43 written on it, tags with writing on them, and rubber bands.  There were also several loose kernels of corn left in the trunk area of the vehicle.  Surveillance units observed YE being picked up by MO at Enterprise.  After MO, YE, LI and HONGWEI ate at a local restaurant, they checked in to a local hotel near the airport for the evening.

37.    On Sunday morning 9/30/2012, the listening device in MO's Ford escape recorded MO and others, believed to be LI, YE, and WANG, discussing how the packages were going to be divided to carry for transport.  The individuals discussed LI's bag being full of "F1s" and that MO would carry some as well.  They discussed that in the past they have sent three separate packages by different means and they all got through.  MO continued to instruct YE on how important it was to thoroughly clean the rental cars before being returned because, "[He] did not want to leave any traceable marks or clues in the car."  MO further told YE that in the past, he (MO), WANG Lei, and Dr. LI washed the car together.  MO added that he's cautious because

he's, "...Done it too many times—way too many times."

38.    Surveillance then observed MO and YE depart for the airport in the White Ford Escape.  LI and HONGWEI departed shortly later in the Malibu rented by HONGWEI.  At the airport, the U.S. Customs and Border Patrol conducted border crossing searches of YE's and LI's checked bags.  YE and LI were flying to China, and MO and HONGWEI were on domestic United States flights.  Inside LI's two checked bags, USCBP officials located two bulk-sized microwave popcorn boxes, each appearing to be factory-sealed.  Upon opening the boxes, on top were actual microwave packages of popcorn, but once they were moved, inside each box were approximately 100 small manila envelopes with a generic number written on each one, e.g. 2155, 2403, 20362, etc.  The generic numbers on the envelopes do not correspond to GPS coordinates nor do they correspond to any legitimate product ID code for Pioneer, Monsanto, or other corn seed manufacturers that could be determined.  Your affiant believes these generic numbers were utilized to additionally obscure the true owner or identity of the product and that MO and/or his co-conspirators are maintaining a "key" that identifies what product or location each of the generic codes corresponds to.  In addition to the two popcorn boxes, LI also had approximately thirteen brown grocery type bags with a generic number written on the outside, e.g. "F1" Each of these bags contained additional envelopes.  These thirteen bags were also in LI's checked bags.

39.    An outbound inspection of YE's checked luggage revealed that he had approximately thirty subway napkins wrapped around individual kernels of corn secreted in his clothing within his bag.  Since MO and WANG were flying domestically, their luggage was not subjected to a USCBP search.

40.      USCBP personnel contacted both YE and LI at the gate area to inform them of the outbound inspection and to ask them for an explanation.   LI spoke very little English and was unable to provide any answers.   YE, who is reported to speak good English, was at a nearby gate area.   Airline personnel repeatedly paged him to which he failed to respond even though he was sitting in the immediate vicinity.   USCBP personnel then approached him and interviewed him. YE stated he did not know anyone else in the local area and was traveling by himself.   USCBP personnel located additional napkins with corn seed in YE's pockets.   USCBP personnel have detained all of the corn seed located at O'Hare in the luggage of YE and LI, and on the person of YE.

41.      FBI surveillance of HONGWEI observed him obtain a boarding pass at a United self-check terminal.   Airline personnel confirmed he was scheduled to fly to Burlington, Vermont.  FBI agents in the Omaha Division coordinated with FBI agents in Burlington, VT to conduct surveillance of HONGWEI upon his arrival and coordinate with USCBP at the Canadian border to conduct an outbound inspection if he attempted to cross into Canada.

42.      FBI surveillance agents in Burlington located HONGWEI's car at the Burlington airport that he previously used to cross the border, and established surveillance.  Surveillance personnel stated that when HONGWEI arrived at the airport terminal, he appeared to be surveillance conscious.   After leaving the airport in his car, surveillance agents reported that HONGWEI engaged in a series of driving maneuvers deliberately designed to detect and evade surveillance.   Surveillance agents lost contact with HONGWEI when he made a quick turn without a signal into a mall parking lot.  The surveillance agents notified USCBP personnel at two nearby border crossings that contact was broken and to be alert for HONGWEI.

43.     At approximately 7:40 p.m., USCBP personnel at the Highgate Springs Port of Entry observed HONGWEI's vehicle and directed it for secondary screening pursuant to their border crossing search authority. A search of HONGWEI's car and luggage in the car revealed that he had approximately 44 bags hidden under his seat and in his luggage. Each of the bags (nearly identical to the brown grocery sacks contained in LI's luggage at the airport) had a generic number written on it, such as M3, F3, Z3, etc. Inside each bag were approximately twenty manila envelopes with varying amount of corn kernels in each envelope. The envelopes were numbered in a similar manner to the envelopes obtained at O'Hare airport. Also located during the outbound inspection was a notebook containing numerous GPS coordinates along with handwritten notes next to each set of coordinates in Chinese Mandarin. HONGWEI also had a digital camera containing hundreds of pictures of various corn fields and what appear to be production facilities for corn seed manufacturers such as Monsanto and Pioneer Hi-Bred. During an interview of HONGWEI, he stated he had been visiting in Burlington for several days. When he was confronted with a boarding pass for his flight to Chicago, HONGWEI admitted he had traveled to Chicago. When asked why he had the corn hidden, he explained he knew he could not legally take the corn in to Canada. HONGWEI stated he purchased the corn from an individual in Chicago named Mo Hailong. After completing the search and interview of HONGWEI, he was released and all his property was returned with the exception of the kernels of corn.

21

44.     The FBI obtained search warrants issued by the Northern District of Illinois and the District of Vermont for these packages of seeds detained from LI, YE, and WANG. A representative sample of this seed that was seized at the O'Hare airport and Canadian border, along with a sample of the seed seized from the FedEx shipment in May 2012, was submitted to an independent bio-diagnostic testing laboratory.  Seven different samples were submitted that were seized from YE, three from HONGWEI, and one from LI.  Of the seven submitted for YE, three samples were confirmed to likely be an inbred line of seed with the other four a seed mix. One sample was an inbred line and two a hybrid line for the three submitted for HONGWEI. The sample submitted that was seized from LI was confirmed to likely be an inbred line.  All of the thirteen samples submitted from the FedEx seizure were confirmed to likely constitute a hybrid line of seed.  Lab testing is unable to identify the manufacturer of any of the seed samples.

45.     Court-authorized GPS tracking showed YE and LIN making multiple stops in rural areas during the same time period of the court-authorized audio surveillance of their car. The FBI confirmed that many of the stops made by YE and LIN were adjacent to grower and research fields for several U.S. based seed manufacturers.  The FBI, through interviews of field owners, confirmed grower fields and research fields belonging to Pioneer Hi-Bred, Monsanto, and LG Seeds were immediately adjacent to locations where YE and LIN stopped.  Your affiant believes based on this information, many of the seeds seized at O'Hare airport and the Canadian border on 9/30/2012 are seeds stolen from the fields of these U.S. based seed producers.

## CONCLUSION

46.     Based on the foregoing, your affiant believes there is probable cause to believe that violations of 1832 (theft of intellectual property) have or are occurring.

WHEREFORE, your Affiant respectively requests that the Court issue a Complaint against the above-named individuals.

Respectfully submitted,

_____
Mark E. Betten
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to me this 9th day of December, 2013.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE

23