IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Crim. No. 4:13-CR-00147 |
| v. | ) | |
| | ) | |
| MO HAILONG, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE INSTANT MESSAGE CONVERSATIONS**

Mo Hailong rehashes several arguments raised months ago by Mo Yun to exclude instant message conversations recovered from Mo's office pursuant to a search warrant. In doing so, Mo overlooks that the chats were taken from removable media located in his own office, that any edits made to the chats would have been made by him, and that the chats are highly probative of Mo's involvement in the charged offenses. This court's previous conclusion that the government can authenticate the chats remains unchanged. And Mo Hailong, unlike Mo Yun, cannot claim that the chats expose him to unfair prejudice, or that such prejudice substantially outweighs the probative value of the evidence. The court should deny Mo's motion.

**TABLE OF CONTENTS**

**BACKGROUND** ............................................................................................................. 3

I.     The chats were seized from Mo's own removable drive over which he had sole custody and control ....................................................... 3

II.    The chats are among the government's most probative evidence of Mo's involvement in the conspiracy ....................................... 3

**ARGUMENT** .................................................................................................................. 10

I.     Chats recorded and saved by Defendant are highly probative and not unfairly prejudicial .......................................................................... 10

     A.    Rule 403 ............................................................................................... 10
     B.    The chats are highly relevant ......................................................... 11
     C.    Admission of the chats will not result in unfair prejudice ........ 11

II.    The chats meet a threshold determination of authenticity .................. 14

     A.    Authentication of chats requires "evidence sufficient to support a finding that the item is what the proponent claims it is." ................................................................................... 14
     B.    *McMillan* is inapplicable ................................................................. 15
     C.    The chats meet a threshold determination of authenticity ...... 15

**CONCLUSION** ............................................................................................................. 17

# BACKGROUND

## I. The chats were seized from Mo's own removable drive over which he had sole custody and control.

The communications at issue are instant messages, or online chat conversations, saved by Mo in text and Word files onto a removable drive (a backup storage device) located in his Florida office. In addition to the chats, the vast majority of the contents of the drive contain DBN related materials, while a small number of files relate to his family. The majority of chat file names contain dates; metadata further provides a date the file was last modified, which generally corresponds to the date in the file name.

Mo was the only person working in his office until November 2012 when his first employee was hired; two additional employees were hired in the fall of 2013. The last chat was saved before that, in February 2013, while most of the relevant chats were saved from 2007 through 2010. No one other than Mo was working in that office for the vast majority of the time the chats were saved. If anyone accessed them, it was Mo.

## II. The chats are among the government's most probative evidence of Mo's involvement in the conspiracy.

The chats reflect Mo's role in the conspiracy to steal proprietary U.S. corn seed from as early as January 2007.[1] It was then that defendant Li Shaoming, or "Dr. Li", the COO of Beijing Kings Nower Seed, reached out to Mo about "collecting

---

[1] All dates of the chats are approximate, and are based off the file name of the saved chat, the metadata indicating the last date modified, or both.

US corn breeds." (Ex. 1.)[2] Six months later, in July 2007, Dr. Li impresses upon Mo the importance of their task: "Looking at the current situation in China, gathering and using US corn hybrids and inbreeds are even more significant." (Ex. 2). Dr. Li made clear that US breeds performed well in China, so "we can gain ample leading edges by collecting hybrids or breeding materials directly from the US." (Ex. 3.)

The chats show that much of the focus at the beginning of the conspiracy was on Mo buying Pioneer and Monsanto's top-producing hybrid seed, and shipping it to China. In China, DBN scientists subjected the hybrid seed to laboratory testing and grew it to test its yield, and to obtain female inbred seeds through the process of "chasing selfs." (Ex. 4-14.) The chats make it clear DBN was targeting the germplasm of Pioneer and Monsanto. (Ex. 15; see also Ex. 2, 4, 11, 16-19.) Mo also targeted seeds containing highly valuable traits. (Ex. 4, 11-13, 16, 19, 20.)

The chats also show that from the beginning, the conspiracy involved Mo stealing corn from fields. In September 2007, Mo Yun asked Mo, "can you get any corn?" Mo replied, "sure . . . it's easy to take pictures and easy to pick . . . needed little caution to drive to somewhere unseen as more vehicles are passing by." (Ex. 21.) In late October 2007, shortly after other records show Mo was traveling in the Midwest, Mo sent Dr. Li photographs he had taken of Pioneer fields. (Ex. 22). Mo told Li, "the cobs belong to Pioneer," and the two men discussed whether it was a

---

[2] The chats that are cited as exhibits to this response will be provided in hard copy to the court and the defense due to the volume of the chats. These represent a sample of the chats the government may seek to admit. The exhibits are, for the most part, English translations from Mandarin.

"large field or a testing field," and if the photographed corn had a "*Trait* or not." (Ex. 22).

As the conspiracy evolved, the chats show DBN became increasingly focused on obtaining male inbred seeds, and that the only way to get males was to steal them. In July 2008, for example, Dr. Li asked Mo to find the "main US location(s) for hybrid production fields, that is, the fields where "male parents and female parents are inter-planted in alternating rows to produce hybrid seeds." Dr. Li also told Mo the "next focus" of Mo's work in the United States was "to increase collection quantity; improve collection relevance, and explore channels to obtain inbred male parent." Mo responded with despair, saying he had previously sent "2000 pieces for each variety. Too heavy – I lived in fear for more than a week." Dr. Li ended the conversation by reemphasizing his main goal: "Knowing seed production is an effective way to obtain inbred male parent." (Ex. 8.)

In April 2009, Dr. Li sent Mo an urgent message to step up his efforts. Dr. Li wrote, "Pioneer's prowess [Pioneer's success selling hybrid seed in China] has shaken the Chinese government. There is a serious need for a national hero." (Ex. 18).

By March of 2010, a member of DBN's breeding program emailed Mo saying he was feeling "very heavy pressure." The email noted that DBN produced new varieties of corn "mainly [through] the obtainment of foreign seed industry's breeding resource." The DBN breeder reminded Mo, "you are the only channel for overseas obtainment." (Ex. 23.)

5

In late March 2010, Mo and Dr. Li discussed Mo's upcoming activities in April and May, which Dr. Li described as "the critical period in collecting and buying," that is, buying hybrid seed, and stealing inbred seed from recently-planted fields. Dr. Li noted, "The next month and a half will be very hard work for you, thank you very much!!" (Ex. 24.)

In late July 2010, Mo and a breeder from DBN had the following conversation about security measures used by U.S. seed companies:

> Hailong says:
> A few seed enterprises and independent sales companies purchased by them were topnotch companies and they are enjoying the payback now. Their security work on research and development is very good. I went to the top-secret building and there were people patrolling the parking lot.
>
> LIN Meigen says:
> Haha, be careful that they might escort you back as a business spy someday
>
> Hailong says:
> The field testing areas have very high wires and GPS surveillance positioning, very secretive
>
> LIN Meigen says:
> Dr. LI was talking to me a few days ago about you being cowardly, afraid of being escorted back; and said that it would be better to be escorted back, no need to purchase a flight ticket out of your own packet.
>
> Hailong says:
> Don't know how good the GPS surveillance positioning was, but very scary. Dr. LI is funny. Let him come to the US someday and take a look, and see if he'd be sacred or
> not.
>
> LIN Meigen says:

> Hoho, it should be pretty accurate. The ones used by civilians might not be as good. I heard that the military ones can identify a target that is the size of a basketball.
> Yes, after all, you are in other people's territory Will talk to Dr. SHAO one of these days about us purchasing a small US company.
>
> Hailong says:
> It was mainly all the signs that said no enter. It is very strict in the US with legal standing. It's okay for them to shoot guns.

(Ex. 19.)

In August 2010, Mo and a DBN breeder strategized about "us[ing] the foreigners' technology to beat them." Mo said, "we can combine their male parent with our female parent [breed a stolen U.S. male with a DBN female]. That may very likely produce very good result." But, Mo noted, "Our male parent source is weak," and the DBN breeder agreed that "male parent is hard to get," and that males were "in short supply." Mo and the breeder then discussed "purchas[ing]" a male parent from a U.S. company. Mo said, "Normally they sell one parent for 1 million dollars." He went on to explain that the results were too uncertain for DBN to spend that kind of money, noting, "to use 1 million dollars to try our luck is sort of costly." (Ex. 15.)

In October of 2010, Mo told a DBN breeder that Mo had stolen six corn cobs containing male parents from multiple fields. Mo said he was sending the stolen corn back to China. The DBN breeder noted that, "The parents are usually hard to find, the other company keeps them in good concealment." Mo agreed, explaining that he "would spend a whole tank of gas" when he drove around "for over a day" looking for fields with inbred seeds. Mo told the breeder, "It will be more convenient

7

when I bring you along next year," because Mo could "focus on driving" and the breeder could "focus on looking at the varieties." (Ex. 25.)

Three days later, Mo told Dr. Li about the six cobs he had stolen that were believed to contain male inbred seed. Mo said he got the cobs out of what was likely to be "a seed production field," and that "[t]here were no other fields around." Dr. Li told Mo how to identify hybrid production fields by the planting pattern and the security measures used to remove male inbred seed. Dr. Li explained the fields were planted with four rows of female inbred plants for every one row of male inbred plants, and that the male rows were removed, or, in Dr. Li's words, "manually or mechanically eliminated." (Ex. 26.)

During the same conversation, Mo told Dr. Li that Mo was deliberately targeting fields with mowed down male rows, saying, "I usually go after the ones with clear indication of eliminated male or remaining male." Dr. Li told Mo if he had gone into the fields "[a]round 20 days earlier," the male rows wouldn't have been mowed down yet, and "you can pick the male parent cobs." Dr. Li instructed Mo to look for fields with "eliminated" male rows, which "can confirm it is a male parent and it is a seed production field." Mo said, "I usually pick the cobs of eliminated males," and Dr. Li replied, "Very good," and later told Mo, "Don't worry about [variety] names, just male parents will do." (Ex. 26.)

In December 2010, after Mo had stolen corn throughout the fall, Mo told a DBN breeder that Mo had just shipped four boxes, each containing about 25

kilograms of corn. Mo said, "I would be content if one out of seven is a male parent." (Ex. 27.)

On September 30, 2012, authorities caught Dr. Li, Ye Jian, and Wang Hongwei attempting to smuggle stolen inbred seed out of the country, after these defendant spent weeks stealing corn from Pioneer and Monsanto fields in Illinois. In October 2012, Mo sent a letter to Dr. Shao Genhuo, the chairman of DBN and Mo's brother-in-law. The letter noted that "The team led by Dr. Li worked very hard in the US this time and received sizeable results," but that "unfortunately [their stolen seeds] were seized by US Customs, and the resources were confiscated." Mo complained that Dr. Li had given Mo's name to U.S. authorities. Mo also noted that the stolen corn was marked with "clear sequential" numbers, and that if the authorities compared Dr. Li's stolen seed seized in Chicago with Wang Hongwei's stolen seed seized at the Canadian border, "it would be very easy to determine they were two sets of the same things, and that would make the matter very severe." Mo warned, "The accumulated work done in Northern America could be completely destroyed by Dr. Li's aggressive decision." (Ex. 28.)

In February 2013, Dr. Li asked Mo to export the GPS information used to target fields in order to steal inbred seed in the fall of 2012. Dr. Li told Mo that DBN had obtained "the DNA fingerprint" of the set of stolen inbred seeds Mo had sent to China—this was the set of seeds Mo was carrying on September 30, 2012, which authorities did not find because Mo was flying domestically. Dr. Li said Mo's

set of stolen seeds contained 120-130 varieties of inbreds after the duplicates were removed. (Ex. 29.)

## ARGUMENT

**I.   Chats recorded and saved by Defendant are highly probative and not unfairly prejudicial.**

    **A.   Rule 403.**

Rule 403 provides that the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." All relevant evidence offered against a defendant is prejudicial, and properly so. *See United States v. Meyers*, 503 F.3d 676, 681-82 (8th Cir. 2007). The rule focuses on unfair prejudice, which means evidence that encourages the jury to decide the case on an improper basis, typically improper emotion. *Id.*; *United States v. Anderson*, 783 F.3d 727, 745 (8th Cir. 2015).

The Eighth Circuit has held that when the court considers evidence under Rule 403, "the general rule is that the balance should be struck in favor of admission." *United States v. Augustine*, 663 F.3d 367, 373 (8th Cir. 2011). Other circuits have explained that the exclusion of otherwise admissible evidence under Rule 403 is an "extraordinary remedy" that "should be used sparingly." *United States v. Brooks*, 736 F.3d 921, 940 (10th Cir. 2013); *accord United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011); *United States v. Clark*, 577 F.3d 273, 287 (5th Cir. 2009); *United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir. 1987).

**B.  The chats are highly relevant.**

The chats speak for themselves. They show Mo's intent to target Pioneer and Monsanto's germplasm to use in DBN's breeding program. They demonstrate Mo's knowledge of Pioneer and Monsanto's security measures, and his attempts to evade those measures. They show Mo personally targeting male inbred seed and stealing it out of corn fields. And they show Mo's knowledge of the massive theft of his codefendants in August and September 2012, and his fear that the authorities would tie their theft back to him. The chats are incredibly powerful evidence of Mo's intent to steal trade secrets, and to transport stolen property across state and national lines. They go to the heart of the central dispute at trial, which is Mo's intent. The probative value of the evidence could not be higher.

**C.  Admission of the chats will not result in unfair prejudice.**

The only possible "unfair prejudice" from the chat evidence is if the chats were altered in a way that prejudices Mo. But if the chats were altered, Mo is the one who altered them. Mo recorded and saved the chats on his own hard drive. There is no evidence that anyone else had access to them. It is beyond belief that someone other than Mo could have altered chats from 2007 to 2013 on Mo's hard drive without Mo knowing. Therefore, the court should presume that any changes to the chats benefit Mo, because Mo himself made the changes. And Mo can't carefully save and catalogue chats for years, and then claim the chats are unfairly prejudicial because Mo might have changed them (but won't tell whether he did).

Mo raises a familiar list of so-called "errors" in the chats (Dkt. 532-1 at 3-4), but none of these show unfair prejudice.

1.  Date and file names were added—by Mo.

2.  Several excerpts are merely partial versions of other, longer ones saved under different file names—because Mo chose to save them that way.

3.  Hyperlinks to outside websites are dead—because over the course of six years, the Internet changes. In much the same way, a recorded telephone conversation from six years ago might refer to a restaurant that has since closed.

4.  Attachments referred to in the chats can't be accessed—because Mo didn't save all the attachments with the same dedication as he did the chats.

5.  There are blank areas and unusual spacing—that Mo created.

6.  Excerpts start in the middle of a discussion—because Mo chose to begin there.

7.  Offline communications referenced in a number of excerpts are not available—because the chats are chats, not a complete catalogue of every conversation Mo had in any form over a six year period.

More generally, the Eighth Circuit has followed other courts in "reject[ing] the argument that cut and pasted transcripts of internet chats are inherently untrustworthy and therefore inadmissible at trial." *United States v. Myers*, 575 F.3d 801, 809 (8th Cir. 2009). As this court has previously ruled, the government has met its burden of authentication (Dkt. 420 at 9); any further argument about whether the chats are what the government purports them to be is a matter of weight and

argument for the jury. *United States v. Oslund*, 453 F.3d 1048, 1055-56 (8th Cir. 2006).

Settled precedent also establishes that the chats are admissible even if they might only be excerpts of longer conversations. Just as in the context of audiotapes and transcripts, any alleged gaps in the chats affect the weight the jury should accord the evidence, not their admissibility. *United States v. Byrne*, 83 F.3d 984, 990 (8th Cir. 1996); *United States v. Willie*, 308 F. Supp. 2d 724, 726 (E.D. Va. 2004) (inaudible portions of recorded conversations "simply goes to the weight the jury should accord to the . . . recording; it does not render the evidence inadmissible" under Rule 403.).

Mo is free to argue about what is missing from the chats, but the mere possibility that something is missing doesn't cause unfair prejudice, especially since Mo chose what to keep and what not to. *See United States v. Breton*, 740 F.3d 1, 13-14 (1st Cir. 2014) (file and chat room names found on defendant's computer admissible "even absent further proof of what, if anything, those files contained"); *Safavian*, 435 F. Supp. 2d at 42 (testimony of e-mails that may have been altered limited to "the bare fact of what words appear on a particular e-mail by a case agent or summary witness who neither composed nor received these e-mails.").[3]

Finally, as has already been thoroughly briefed by the government and decided upon by this court, the government need not call a participant in the chats to authenticate them. (Dkt, 287 at 6-9; Dkt. 420 at 9). *United States v. Manning*,

---

[3] *See also* government's response to Mo Yun's motion, Dkt. 297 at 10-11.

738 F.3d 937, 943 (8th Cir. 2014) (chats admissible due to identifying information contained in the chats and the fact they were found on defendant's personal laptop in his home where he lived alone). Nor must the government call a participant to render them admissible under Rule 403. The court expressed some concern over the government's inability to call a witness who participated in the chats when they were to be admitted as to Mo Yun, but again, unlike Mo, Mo Yun was (1) not the person who saved the chats; (2) evidence as to her involvement in the conspiracy was focused on a shorter timeframe; and (3) the probative value of the chats was not overwhelming as it is for Mo. Mo does not sit where Mo Yun sat. The chats are sufficiently trustworthy; any danger of unfair prejudice is slight, and certainly cannot be said to substantially outweigh their probative value.

"There is a difference between evidence that brings unfair prejudice and evidence that is damning." *United States v. Burt*, 495 F.3d 733, 740-41 (7th Cir. 2007). The chats are damning evidence against Mo, but, as his own words that he saved on his own hard drive, nothing about them is unfair.

II. **The chats meet a threshold determination of authenticity.**

    A. **Authentication of chats requires "evidence sufficient to support a finding that the item is what the proponent claims it is."**

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Electronic and documentary evidence such as internet chats may be authenticated "through several methods including, '[t]he appearance, contents, substance, internal

14

patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" Fed. R. Evid. 901(b)(4); *United States v. Young*, 753 F.3d 757, 773 (8th Cir. 2014); 100 Am. Jur. 3d Proof of Facts § 89 (2008). "The party authenticating a document need only prove a rational basis for that party's claim that the document is what it is asserted to be." *United States v. Wadena*, 152 F.3d 831, 854 (8th Cir. 1998). The government may demonstrate authenticity through circumstantial evidence. *Id.* "Once the threshold requirement is met . . . any question as to whether the evidence is authentic is for the jury." *Kaplan v. Mayo Clinic*, 653 F.3d 720, 726 (8th Cir. 2011) (internal citations omitted).

    B.    ***McMillan* is inapplicable.**

Mo renews Mo Yun's argument that the *McMillan* standard should apply to the chats at issue here. (Dkt. 532-1 at 8-12). Mo cites no new case law, and no facts unique to him that should cause the court to reconsider its decision to the contrary. (Dkt. 420). There is no need to reiterate the legal arguments already briefed by the government (Dkt. 297) and ruled upon by this court (Dkt. 420). For the reasons already stated by the government in its response to Mo Yun's motion, and by the court in its order on the same motion, the *McMillan* standard is inapplicable to the chat transcripts at issue here.

    C.    **The chats meet a threshold determination of authenticity.**

The court previously determined that the government had met its burden of authenticating chat transcripts between Mo Yun and Mo. There is more than sufficient evidence to find that the entire set of chat transcripts involving Mo are

excerpts of instant message conversations between Mo and others, such as Dr. Li. The same analysis applied by the court in its previous ruling applies equally here: the chats were found on Mo's removable drive, over which he had control, and the content of the chats themselves provide circumstantial evidence that they are what they purport to be. (*See* Dkt, 297 at 6-9; Dkt. 420 at 7-9). There is only more such evidence here, where the chats span a lengthy timeframe, and discuss a range of Mo's activities in his own words, which will be separately corroborated, such as the purchase of farmland in Iowa, his travel to the Midwest to steal corn, and other matters. Furthermore, the chats contain several indications that they are saved instant message transcripts. (Ex. 6 (Mo says he and Dr. Li "talked by MSN for about 4 hours"); Ex. 19 (Text unattributed to a speaker: "System reminder: Your friend is using MSN Manager supported chat record management"); Ex. 27 (Text unattributed to a speaker: "Don't include information like passwords or credit card numbers in an instant message.")).

## CONCLUSION

For these reasons, the court should deny the Defendant's Motion *In Limine* to Exclude Alleged Excerpts of Instant Message Conversations (Dkt. 532).

Respectfully Submitted,

Kevin E. VanderSchel
Acting United States Attorney

By: */s/ Virginia Bruner*

Jason Griess
Marc Krickbaum
Virginia Bruner
Assistant United States Attorneys
United States Courthouse Annex
110 East Court Avenue, Suite 286
Des Moines, Iowa 50309-2053
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: virginia.bruner@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2015, I electronically filed the foregoing with the Clerk of Court using the CM ECF system. I hereby certify that a copy of this document was served on the parties or attorneys of record by:

____U.S. Mail   ____Fax   ____Hand Delivery

_X_ ECF/Electronic filing   ____Other means

UNITED STATES ATTORNEY

By: /s/ *Marc Krickbaum*
     Assistant U.S. Attorney