IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :
                          :
      Plaintiff,          :
                          :
vs.                       :        Case No. 4:13-cr-00147
                          :
MO HAILONG,               :   SENTENCING HEARING TRANSCRIPT
                          :
      Defendant.          :           Volume III
- - - - - - - - - - - - - -X

Courtroom, First Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Wednesday, October 5, 2016
10:30 a.m.

BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Judge.

KELLI M. MULCAHY, CSR, RMR, CRR
United States Courthouse
123 East Walnut Street, Room 115
Des Moines, Iowa 50309

APPEARANCES:

For the Plaintiff:        JASON T. GRIESS, ESQ.
                          Assistant U.S. Attorney
                          U.S. Courthouse Annex
                          110 East Court Avenue, Suite 286
                          Des Moines, Iowa  50309-5053

                          MATTHEW R. WALCZEWSKI, ESQ.
                          United States Department of Justice
                          600 East Street North West
                          Washington, D.C.  20004

For the Defendant:        MARK E. WEINHARDT, ESQ.
                          HOLLY M. LOGAN, ESQ.
                          Weinhardt & Logan, P.C.
                          2600 Grand Avenue, Suite 450
                          Des Moines, Iowa  50312

                          MARK E. BECK, ESQ.
                          Mark Beck Law, P.C.
                          350 West Colorado Boulevard, Suite 200
                          Pasadena, California  91105

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defendant: | | | | |
| Richard Romanoff | 86 (Weinhardt) | 112 (Griess) | | |
| Allison Tarlow | 120 (Weinhardt) | | | |

E X H I B I T S

| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 - Romanoff report | 111 | 111 |

1              P R O C E E D I N G S

2              (In open court with the defendant present.)

3              THE COURT:  Thank you.  You can be seated.

4              We are back in the matter of United States vs. Mo

5    Hailong.  The United States continues to be represented by AUSA

6    Jason Griess and Matt Walczweski, and we've been joined for the

7    last three days by the case agent, Mark Betten.  We also have

8    joining us Probation Officer Stacy Dietch, and then Mr. Mo

9    appears here personally and represented by his attorneys, Mark

10   Beck, Mark Weinhardt, and Holly Logan.

11             We have some additional evidence that we're going to

12   take.  I did want to ask the parties before we start with

13   Dr. Romanoff, where are we at on restitution?  Is there going to

14   be evidence presented on that today or what's the plan?

15             MR. GRIESS:  Your Honor, Mr. Weinhardt and I spoke

16   about this this morning.  The Government does have some more

17   specific information, but it needs just a little bit more

18   tweaking.  We have agreed, if it's all right with the Court, and

19   at the Court's earlier suggestion, that that matter be put off

20   for a period of time to a later date.

21             THE COURT:  Okay.  Then let's go ahead with testimony.

22             Dr. Romanoff, is he here?

23             Yes.  Go ahead and come forward.

24             RICHARD ROMANOFF, DEFENDANT'S WITNESS, SWORN.

25             MR. WEINHARDT:  Your Honor, before we start the

1  testimony, we believe that it will be unavoidable during parts

2  of this testimony that we get into matters that we discussed

3  with the Court in chambers on Monday are confidential, and so we

4  would ask at this time that the courtroom be cleared of persons

5  not associated with the parties and the courtroom be sealed.

6           I have spoken to Mr. Griess about this, and we've

7  agreed that those law enforcement officers that are here and not

8  just the case agent may remain, provided that they understand

9  that they are under an obligation of confidentiality about what

10  they hear today.

11           THE COURT:  That's fine.  Is there anybody here in the

12  courtroom who is not either a lawyer or a law enforcement

13  officer of some kind?

14           Okay.  I'll ask you to step out at this time.  How

15  long do you -- well, we anticipate, really, that we'll probably

16  be back in an open setting after lunch, right?

17           MR. WEINHARDT:  I think that's correct.

18           THE COURT:  Okay.

19           MR. WEINHARDT:  And I guess I would expand the

20  definition beyond lawyer and law enforcement to also include our

21  witnesses and clinicians.

22           THE COURT:  Okay.

23           MR. WEINHARDT:  We have a couple who fit into that

24  category but who already know everything we're going to talk

25  about.

1           THE COURT:  Okay.  That's fine.  So we'll excuse

2    everybody else at this time, and I'll ask, probably, the U.S.

3    Marshal just to keep an eye on the door in case we have people

4    come in.  We'll check and see who they are.

5           (The portion of the transcript from page 86, line 5

6    through page 129, line 25 is contained in a separate transcript

7    filed under seal.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

130

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          AFTERNOON SESSION (1:15 p.m.)

2          (In open court with the defendant present.)

3          THE COURT:  Thank you.  You can be seated.

4          We are back on the record in the matter of United

5   States vs. Mo Hailong.  We are joined again by all of the

6   parties that were here earlier in the day and by Mr. Mo himself

7   personally.

8          I want to talk briefly about restitution before we get

9   to final arguments in the case.

10         Mr. Griess, are the seed companies going to be

11   asserting any kind of actual loss in this case or are they just

12   seeking -- I mean actual loss beyond sort of legal fees and

13   costs.

14         MR. GRIESS:  No, Your Honor.

15         THE COURT:  Okay.  And are they still both seeking

16   legal fees and costs?

17         MR. GRIESS:  Yes.

18         THE COURT:  And are those amounts as previously

19   articulated, just with more detail?

20         MR. GRIESS:  Your Honor, they are as previously

21   articulated with a little bit more detail.  However, in looking

22   at what I've initially received, I want to go through them and

23   confirm some details.  That process will not take very long.  I

24   would expect I would be able to provide those final numbers and

25   figures within a week.

1          THE COURT:  Okay.  So I'll have you turn all that

2    material in within a week, and then we'll set a hearing up 60

3    days after that material is turned over to the defendants, and

4    we'll reconvene at that point to finalize restitution amounts in

5    this case.

6          Mr. Weinhardt, I assume you want an evidentiary

7    hearing on that or do you want me to proceed based on the

8    record?

9          MR. WEINHARDT:  No.  We want an evidentiary hearing

10   because we don't agree, based upon what we've seen so far, that

11   everything is properly recoverable under the restitution

12   statute.  In fact, I think, based on the materials he has so

13   far, the Government doesn't even agree that it's all

14   recoverable, and that's what Jason wants to try to figure out in

15   the next week.

16         THE COURT:  Okay.  We'll take a look, then, at those

17   materials down the road.

18         Let's turn, then, now that we've heard all the

19   evidence in the case, I'll go ahead and formally calculate the

20   advisory guidelines.  To avoid ex post facto concerns, I will be

21   using the 2012 sentencing guidelines in this case, which are

22   more advantageous to Mr. Mo with respect to the one upward

23   adjustment and with respect to the fine range that is applicable

24   in this case.

25         So we have a base offense level of 6.  There's then a

1  28-level upward adjustment for intended loss, and that intended

2  loss amount that I found was $320 million.  We have a two-level

3  increase for sophisticated means.  There are no other upward

4  adjustments.

5          There's a two-level decrease for acceptance of

6  responsibility.

7          Mr. Griess, are you moving for that third level as

8  well?

9          MR. GRIESS:  Yes.

10          THE COURT:  So we have a total offense level of 33.

11  Mr. Mo is a criminal history category of I, so ordinarily the

12  advisory guideline range would be 135 to 168 months'

13  imprisonment, although here the statute caps out at 120 months,

14  so our range effectively becomes 120 months to 120 months.

15  However, we then have the Rule 11(c)(1)(C) plea agreement that

16  caps that sentence at 60 months' imprisonment, and I will stick

17  within that range of 0 to 60 months.

18          Probation of one to five years is an option under the

19  statute, although not recommended by the guidelines, and here

20  not agreed to by the parties, other than at the bottom end of

21  that particular range.

22          Supervised release of one to three years is

23  applicable.  The recommended fine range is $17,500 to $175,000.

24  There is a $100 special assessment.

25          It certainly appears that Mr. Mo has the ability to

1    pay a fine based upon the information contained in the

2    presentence report.  Whether or not he has that ability in

3    connection with any large restitution order that may be entered

4    is a different question, and we'll have to tackle that as we

5    move forward here today and then at the later hearing.

6              So let's go ahead and turn to variance arguments.

7    Mr. Griess, are there any victims who wish to be heard by the

8    Court before sentence is pronounced today?

9              MR. GRIESS:  No.

10             THE COURT:  Okay.  You can go ahead with argument,

11   then.  You're welcome to sit, stand, use the podium.  Whatever

12   is most comfortable for you is fine.

13             MR. GRIESS:  Your Honor, thank you.

14             First of all, with regard to variance arguments, are

15   you also including in that our assessment of the 3553(a)

16   factors?

17             THE COURT:  Yes.  Essentially, whatever arguments you

18   want to make on what an appropriate sentence is in this

19   particular case.

20             MR. GRIESS:  Thank you, Your Honor.

21             And I will, if it's all right with the Court, choose

22   to sit on this.  And I apologize in advance if this is a little

23   disjointed, but I'm going to try and get through this rather

24   quickly in accordance with the Court's order.

25             The Government in this case is seeking a sentence that

1   reflects the nature and circumstances of the offense and the

2   need for the sentence in that case to do so.  This is a

3   long-running conspiracy, as I know the Court is well aware.  It

4   spanned from 2007 to 2013, employed sophisticated means, which

5   the Court has already discussed in detail, including the

6   international shipment and transport of stolen seed germplasm.

7           It involved dozens and probably hundreds of instances

8   of trespassing in fields to steal competitors' breeding

9   resources, as it was often referred to.  It resulted in the

10  theft of the best corn germplasm in the world, something neither

11  Pioneer nor Monsanto have, but that is the combination of both

12  of their best inbred germplasm.  That makes this a very, very

13  serious offense.

14          And while the defendant's role was not of a leader, as

15  determined by the Court, he was far from a mope or a flunky in

16  this case.  He was a constant willing participant who managed to

17  successfully navigate all of the security and protective

18  measures over the course of many years.

19          As one example, and there are many, and I just direct

20  the Court's memory to the Government's offense conduct in this

21  regard and some of the other evidence that was submitted by way

22  of exhibit, but there were discussions where they discussed the

23  difficulty in being able to commercially purchase seed under the

24  circumstances when they did not want those seed dealers to know

25  information about them, and he was able to successfully do that

1  on numerous occasions over the course of the conspiracy.

2         Other members of the conspiracy offered regular praise

3  of his conduct.  One in particular, in March of 2010, Mr. Mo is

4  discussing with Mr. Che, who was a member of DBN's breeding

5  program, how much hybrid seed he would need to be able to send

6  back to China in 2010.  Che explained that the breeding

7  department was feeling very heavy pressure to produce new

8  varieties and hybrid and that this was going to occur, quote,

9  mainly through the obtainment of foreign seed industries'

10 breeding resource.  And Che at that time reminded Mr. Mo, "You

11 are the only channel for overseas obtainment."

12        And this was essentially how it went in this case

13 until 2012 when some individuals -- and actually earlier than

14 that when some individuals came over to assist him in that

15 regard.

16        There is a need, Your Honor, in this case for the

17 sentence that the Court imposes to reflect the seriousness of

18 this offense.  There have been lots and lots of cases that have

19 been cited to the Court, but very few, if any of them, involved

20 an intended loss of at least $320 million.  And I know from the

21 Court's review, at least from the Government's perspective, the

22 Court will understand that this is a very conservative estimate

23 and amounts to what involved a discussion between two of the

24 members of the conspiracy.

25        The truth of the matter is the full impact of this

1  crime is currently unknown.  What we do know is that there were

2  many, many instances of the international shipment of both

3  hybrid and inbred corn seed and that there was unlawful

4  utilization of that corn germplasm by scientists in China to

5  determine its genetic makeup -- not to grow it, as it was

6  intended to be sold, but to determine its genetic makeup, that

7  was obviously the goal of the conspiracy in this case -- and

8  that there was significant theft of both hybrid and inbred corn

9  seed containing trade secrets in 2010 and 2011 and in, most

10  likely, 2012 as well, as is illustrated in the Government's

11  offense conduct.

12         The parameters of this particular theft that occurred

13  over seven years will likely not be known for several years, and

14  the true measure will be measured in the loss of market share

15  that Pioneer and Monsanto and perhaps other seed industries will

16  feel as they come to know the full impact of this crime.

17         And this is reflected in more than just corporate

18  profits or the corporate bottom line.  It's going to reflect

19  itself in incredible economic impact that could be felt that

20  will involve the loss of jobs and job opportunities if this

21  Chinese market or part of it is lost as a result of the

22  defendant's theft.

23         And this is market share that Pioneer and Monsanto

24  have earned through years of research and development,

25  innovation, trial, and hard work.  And unlike other types of

1  theft, once those trade secrets are out, there's no getting them

2  back.  The innovation and effort it took to develop those trade

3  secrets is gone.

4       Now, the evidence is clear that Mr. Mo was well aware

5  of the import of his actions -- or, excuse me, the impact of his

6  actions, and, again, I'll refer the Court to the Government's

7  offense conduct letter in great detail.

8       Beyond that, Your Honor, and this is the center of the

9  Government's argument, is there is a huge need in this case to

10  afford adequate deterrence to the defendant's criminal conduct.

11  We need to impose a sentence, or the Court does, which doesn't

12  lead other would-be thieves, whether they're foreign or

13  domestic, to conclude that stealing a competitor's trade secrets

14  is worth the risk.

15       There's going to be a cost-benefit analysis that goes

16  on, and given the value or the intended value of the theft in

17  this case, a sentence of probation certainly is going to lead

18  individuals to conclude that such a theft is worth the risk.

19       And even if the defendant could or was willing to

20  write the victim seed companies a check for the full amount of

21  the intended loss in this case, there would still be a massive

22  loss, because in all trade secret cases, once the trade secrets

23  are gone, their value is significantly diminished.

24       For that reason and the other reasons which we're

25  going to cite here in a minute, Your Honor, a sentence of five

1  years' imprisonment is what the Government seeks.  We find that

2  to be the sentence that's sufficient but not greater than

3  necessary to achieve the goals that we've discussed in this case

4  and including, most importantly, to reflect the serious nature

5  of the crime and afford adequate deterrence to future criminal

6  conduct.

7          With regard to fine, Your Honor, the Government does

8  not believe that a fine is the best way to punish the defendant

9  in this case, and we feel like what money he has at his disposal

10  is better spent on caring for his family and some of the things

11  we've heard today and on paying the restitution to the victim

12  companies, so we are not seeking a fine.  Rather, to reflect the

13  serious nature of the offense, we ask for a sentence of five

14  years' imprisonment.

15          With regard, quickly, Your Honor, to some of the other

16  arguments that were made, first of all, with regard to Mr. Mo's

17  medical conditions, the evidence in that case consisted of the

18  testimony of Dr. Wise, who hasn't worked for the Bureau of

19  Prisons in approximately 12 years, and is currently consulting

20  based upon his review of records and documents and his knowledge

21  when he was there approximately 12 years ago, and then on a

22  submission, Government Exhibit No. 60, that was presented by the

23  Government of Dr. Harvey.

24          Dr. Harvey is currently employed by the Federal Bureau

25  of Prisons in a significant way.  He's the regional medical

1    director for the north central region, this region, and he has

2    been since May of 2009.  He's intimately familiar with the

3    process of categorizing defendants and placing them, and while

4    he may not classify them personally and take part in that

5    process directly, he's certainly aware of it, as he demonstrates

6    through his letter.

7           And therefore, when he indicates that the defendant

8    will likely be a Care Level IV, I think that's an opinion that

9    requires the Court to give it some credibility.  He indicates

10   that at a Care Level IV, he will be able to receive the same --

11   or, excuse me, the prescribed treatment and medication as was

12   recommended by his physicians.  In other words, there's nothing

13   that he will need that he won't be able to have.

14          Of course, he may not be able to have exactly as he

15   wants, and you can certainly understand -- the Court can

16   certainly understand why that couldn't be the case regardless of

17   the circumstances.  But it explains in great detail, and

18   Dr. Wise has too, that there are efforts in order to provide for

19   the best interests of the patient's health, not necessarily

20   putting cost first, but to provide for the best interests of the

21   patient's health.  And through all the evidence that was

22   obtained, it's clear that the Government will -- or, excuse me,

23   the Bureau of Prisons will be able to afford those opportunities

24   to the defendant.

25          I would just add quickly by way of example that the

1  cases cited by the defendant where the Court found that there

2  needed to be a departure to probation involved much, much more

3  serious conditions than the defendant is currently facing.  And

4  the law requires the Court to consider the defendant's current

5  health situation, and all of those cases involve very, very

6  serious current situations, whereas the defendant currently,

7  fortunately, is not facing a cancer situation as he is in

8  remission.

9        All of his concerns with the ability of the Bureau of

10  Prisons to adequately detect that cancer have been addressed by

11  Dr. Harvey, and I would ask the Court to not consider that a

12  significant basis for departure.

13        With regard to the family health concerns that we

14  heard about this morning and briefly this afternoon, clearly,

15  this is a tragic situation, and to the extent, unfortunately,

16  it's been exacerbated by the court case, it's the defendant who

17  bears the blame.

18        Unfortunately, they're not extraordinary, and I

19  shudder to think what would happen or what we would find if we

20  turned some of the same high-power resources on many, many of

21  the defendants that come before this Court.  I think we would

22  see the same thing over and over and over again, and it just

23  does not justify a sentence of probation.

24        Dysfunctional families, unfortunately, are common, and

25  to sentence the defendant to probation based upon these

1  circumstances, which are all too common, would be unfair to all

2  the other defendants who come before this Court.

3         With regard to the immigration consequences that the

4  defendant possibly may face, I would just say that the Court

5  should -- or I would ask the Court not base in any significant

6  way a departure on these immigration consequences.  While I

7  believe the defendant is correct that if he is sentenced to more

8  than a year he will be an aggravated felon, his deportation as a

9  result of that is far from certain.

10         He will have the opportunity to appear before an

11  immigration judge and argue for any number of exceptions which

12  would not result in his deportation.  While it is possible and

13  remains possible that he could -- an immigration judge could

14  conclude that he should be deported, I think in this case it's

15  far more important that the Court base its sentence on what

16  occurred in the case, the nature and circumstances, the need to

17  afford deterrence, and reflect the serious nature of the crime.

18         Finally, Your Honor, with regard to sentencing

19  disparity, this is a serious, serious crime that continued for a

20  very long time, and the loss amount, again, is at a level where

21  it would be disparate not to impose a sentence of imprisonment.

22  When you consider all of the facts and circumstances, and I'm

23  not -- there are many cases, and some of the cases cited by the

24  defendant involve facts -- well, they all involve loss amounts

25  that are much, much smaller than we have here.  Some of them

1    involved 5K motions.

2           But it's the Government's position that anything other

3    than a significant prison sentence is going to actually

4    depreciate the seriousness of the crime, and so based upon that

5    we remain in our position of five years' imprisonment to reflect

6    those factors.

7           Your Honor, I know I've gone quickly through this, but

8    I'm trying to comply with the Court's order of 15 minutes, and

9    unless the Court has additional questions of me, those are the

10   Government's arguments:  a sentence of five years' imprisonment,

11   a mandatory $100 special assessment, no fine, restitution as to

12   be determined by the Court in the future.  Obviously, the Court

13   will need to impose a period of supervision upon his release

14   from prison.

15          I would also ask that the judgment or that the

16   sentence reflect the forfeiture that the defendant has agreed

17   to, and I believe there's been judgments of forfeiture that have

18   been provided to the Court prior to today's date.  I just ask

19   that those be reflected in the actual sentence.

20          THE COURT:  Thank you.  I know we did a forfeiture of

21   the real property.  I think we may have left standing some

22   forfeiture of some other property, perhaps, but we'll make sure

23   all of this gets into the final J & C.

24          I'll swing back to you if I have questions.

25          Mr. Weinhardt.

1          MR. WEINHARDT:  Thank you, Your Honor.

2          Before this Court for a year and a half but for many

3   of us going on three years, we have talked about what a group of

4   co-conspirators did, what Robert Mo did, what the Government did

5   to investigate it, but only this week and today do we get to

6   talk about who he is.

7          So I'm going to start to talk about the history and

8   characteristics of the defendant first, and then I will address

9   some of the other factors.  I'm not going to try to touch every

10  3553(a) factor, I think the Court knows them amply and will do

11  that, but I want to highlight the ones I believe are important.

12         In the course of his pretrial release in this case, he

13  was supervised for a lengthy period by veteran federal law

14  enforcement officers; in one case by Mr. Peoples, who wrote to

15  this Court, for 19 months.  These are people who have -- we've

16  gotten to know them fairly well.  Mr. Beck and Mr. Peoples know

17  a number of people in common.  But they have been around the

18  block and their judgment is good, and they know this man as well

19  as anybody on earth at this very moment.

20         Here's what Mr. Peoples said based upon that

21  experience:  That he is a perfect gentleman, that he is a model

22  citizen and a committed family man.

23         And another one with similar experience, Michael

24  Moliere said -- really, it's been an incredible statement -- "In

25  my 43 years in public and private law enforcement security work,

1  I have never dealt with a more respectful or compliant

2  individual."

3          One of the ways that the Court assesses the way that a

4  defendant is going to react to a sentence that the Court imposes

5  is how did he react between the time of arrest and up to the

6  time that sentence is imposed, and his reaction has been

7  exemplary and unusual and all in a positive way.

8          The other letters about Mr. Mo that the Court has seen

9  point out that he is an attentive and passionate parent, he is

10 the rock for the rest of this family.  He has, and this is a

11 quote, genuine care for the people around him.  He helps people

12 to get settled into this country.  He goes out of his way to

13 teach them to play tennis.  He created a program through his

14 church to help settle new immigrants to this country.

15         At the same time, the letters say that he was -- is

16 ashamed and filled with remorse, that's a quote; another one,

17 that he is embarrassed by what he did and is completely

18 remorseful of his actions.

19         And this, I think, is a key fact about who he is from

20 the letter from Xiaomu Li.  "Although Robert is extremely smart

21 and intellectually curious, he sometimes seemed child-like,

22 naive, and gullible."

23         And I'm sorry, Robert.

24         But all of us on the defense team have had the same

25 reaction, that we struggle to find a combination of someone of

1  such immense intelligence and academic achievement on the one

2  hand and naivety and lack of street sense on the other.

3          It's why, after the Tiananmen Square uprising, when

4  students were asked and asked and asked what they had done and

5  what they believed, they were all shrewd enough to lie to the

6  interrogators, except Robert, who suffered academic punishment

7  because he was the only one who was gullible and open enough to

8  tell the truth.  That naivety has persisted throughout the

9  offense conduct in this case and in some ways has persisted to

10  today.

11          Mr. Mo did not come to this country or to this

12  business with bad motives.  Others did.  The co-defendants in

13  this case are agricultural scientists who came to the United

14  States to get these technologies.  Mr. Mo has no background in

15  agriculture and came to this country to free himself, frankly,

16  from the yoke of the family business.

17          But through a series of bad breaks -- 9/11 and what it

18  did to immigrants who wanted to work on defense contracting,

19  Florida International University losing the grant that accounted

20  for his job due to the work of other people -- made DBN a

21  sheepish last resort for him to support his family, and so

22  that's where he wound up, where he did many, many things and

23  does many things other than trying to obtain technology in the

24  corn industry.

25          That, then, I think, takes us to the nature and

1   circumstances of the offense.  And I don't disagree with

2   Mr. Griess that there were dozens, if not hundreds, of entries

3   onto fields at certain times.  I don't disagree that in certain

4   ways the scope of this was very wide.  But I think that the type

5   of mental state matters.

6          If this were, for example, an insider trading case

7   with $320 million of either intended or actual loss involving an

8   executive who knows that a federal statute criminalizes insider

9   trading, that's one kind of criminal intent, a person who knew

10  the criminal law and tried to see if he could evade it.

11         But in this case, the trade secret statute is merely a

12  criminalization of a statutory civil tort.  It doesn't have the

13  word "willfully" in it, it does not require any understanding

14  that the thing that you are doing is a crime.

15         So Mr. Mo's appreciation of the wrongfulness of what

16  he was doing is something that only grew gradually over time.

17  This wasn't a determination, "This is a crime, let's go see if I

18  can get away with it."  It might have been on the part of these

19  agricultural scientists who came to our shores in order to

20  commit theft.  That's not the case for Mr. Mo.

21         The duration of the mental state also matters.  The

22  conspiracy, in some sense, ran from 2007 to 2013, but lots of

23  everything that Mr. Mo did was, in his view, not criminal.  It

24  was only when he starts to cross onto the fields, I would

25  submit, and cross onto the fields with a specific intent, "Let's

1    find inbreds," that that's when he, in his own mind, starts to

2    cross the line into criminal wrongdoing, and that didn't happen

3    until 2010.

4            Prior to that, there was only this brief sort of

5    ham-handed taking some things from commercial fields, field

6    corn, with Mo in 2007.  But otherwise there was no evidence of

7    going onto fields in an attempt to target technology until 2010.

8    And even then, and this is in PSIR paragraph 67, he got 15 ears

9    of corn, of which only 6 were believed to be inbreds.

10           The real collection happens in 2011.  And even when

11   the real collection happens in 2011, Mr. Mo relatively is a

12   break on that collection because in 2012, recall that the

13   co-conspirators are recorded saying how much faster they were

14   able to go, how much more Dr. Li was able to get away with

15   because Mr. Mo wasn't there to hold them back.  And it was in

16   2012 instead that Mr. Mo decides he doesn't want to be involved

17   in this anymore.

18           Now, the Government can hit me all over the head if I

19   try to argue that there was a withdrawal from the conspiracy.  I

20   understand that for less than 48 hours at the end of September

21   he flew up and assisted those individuals in getting out of the

22   country, although the only piece of evidence that the Government

23   has -- or I should say had to show that the third batch of seeds

24   left the country was Government's Exhibit 1-82, which is an

25   acknowledgment from Dr. Li of receipt of 120 or 130 varieties.

1          The Government now concedes that we are right, that

2     the date on that document is wrong, it's not from February of

3     2013 but is, for some computer reason, misdated.  The clue for

4     when that document was actually generated is from what Dr. Li

5     asks Mr. Mo to do, which is to download to him the GPS log from

6     the car that was being driven.

7          Well, Mr. Mo didn't have access to the GPS of a rental

8     car months after the September 2012 trip, he only had access to

9     the GPS from the car that he drove, and that was 2011.  We deny

10    that the third batch of seeds went across the pond in 2011.

11         The Court has recognized that Mr. Mo was essentially a

12    pawn in this matter, not -- I'm not arguing that he's a flunky

13    or a mope, to use Mr. Griess' terms, but I am going to argue

14    that Mr. Mo's role was conducted and driven from the outside,

15    and I think the Court has properly recognized that.

16         I also believe that there is a difference criminally

17    between actual loss and intended loss.  Maybe there will be some

18    fallout from this offense in the future, but maybe this is

19    simply an attempt that did not succeed.  There is not a shred of

20    evidence that anything has made it into any commercial field,

21    any production, anything for sale anywhere, even though this

22    offense going back to the 2011 collection is now five years old.

23         There's no evidence to support the idea that this

24    succeeded, and attempts -- this goes back to the first

25    principles hundreds of years ago -- attempts are sentenced

1    differently than completed crimes.

2           Also, the last thing about nature and circumstances of

3    the offense is this:  This Court recognized correctly when we

4    argued the Hingorani sentencing that 2B1.1 is sometimes just

5    broken because of the way that large numbers inflate the

6    criminal consequences of what people actually did.  I would

7    submit that this is a poster child, especially given that it's

8    an intended but not an actual loss case, for that problem.

9           Mr. Mo spent 22 1/2 months away from his family on

10   pretrial release.  10 1/2 of those months he was interrupted an

11   average of 28 times a day, and he never had a personal space to

12   his own.  There was always an open door between him and somebody

13   who was watching him.

14          And then when he finally did have some personal space,

15   he has always, ever since then, been watched by cameras or

16   watched directly.  He's worn two ankle bracelets.  Because of

17   the cameras, none of his children have friends who will ever

18   come to visit their house because they're afraid of the cameras.

19          He has been inspected and reviewed and followed in

20   every possible manner.  That is not a typical pretrial

21   detention.  I understand why it happened and, given the

22   resources of his family and his foreign national status, the

23   concerns that motivated it, but that's different in a way that

24   the guidelines do not take into account, and that is a reason

25   why he should have a different sentence than what the guidelines

1    call for.

2          By the way, just with regard to the family situation,

3    and I'm not going to talk about that factually at all, but I am

4    going to say this:  It is noteworthy, as the Court tries to

5    predict what's going to happen in the future, that in those

6    22 1/2 months Mrs. Mo only caused her children to see their

7    father once for a very few days, once in 22 1/2 months.

8          Next I'd like to talk about the medical situation.

9    Mr. Wise has not worked for the BOP for a while, but he

10   described all the things that he does to keep current on what it

11   is that they do, and there was no showing that his knowledge

12   isn't absolutely current as of today.  And the Government

13   produces no witness to counteract anything that Mr. Wise says.

14   It relies on this letter.

15         But crediting the letter, here's what we know:  Number

16   one, we don't know if Mr. Mo is going to be a Level IV or a

17   Level II.  Dr. Harvey doesn't say he's going to be a Level IV,

18   and Dr. Harvey doesn't predict that.  On the logic of what a

19   Level IV means, needing daily care, Mr. Mo is not a Level IV,

20   and there are long wait lists for those beds.

21         Secondly, will he get the screening that Dr. Araujo

22   prescribes that he should have on the intervals, and so forth,

23   that he should have?  Inspect Government Exhibit 60 carefully.

24   It recognizes that protocol.  It does not say that Mr. Mo will

25   get it.

1          Third, if he gets it, will the scans be looked at by a

2    medical oncologist, much less a sarcoma specialist?  Dr. Harvey

3    is a regional director, but he is also the medical director for

4    four out of the 18 facilities that he is supposed to oversee

5    because four of them don't even have the medical director on

6    site that they're supposed to have.  How can we have faith that

7    those Level II facilities will access a medical oncologist when

8    most of the care is given by non-doctors?

9          If he sends the records away to someone and a medical

10   oncologist does review them, how do we know that the Bureau of

11   Prisons is going to agree with their recommendation?  If he gets

12   sick and goes to Butner, how do we know about the quality of the

13   treatment that he's going to receive given that the

14   uncontradicted evidence is that that is not known as being a

15   sarcoma center?

16         And finally, will he be in the BOP at all?  The

17   uncontradicted evidence from Mr. Wise is most foreign nationals

18   in Mr. Mo's situation go to private prisons.  They don't go to

19   the BOP or they don't have the same medical regimen.

20         And this is what the Department of Justice said about

21   the BOP medical situation -- or the non-BOP medical situation in

22   August:  "We determine that the BOP is unable to effectively

23   identify problem areas among the contract prisons or contractors

24   to proactively take action before a problem becomes acute or

25   systemic."  They're talking about the BOP's ability to monitor

1    the medical care in contract prisons.

2           We have no idea what kind of care Mr. Mo is going to

3    get.  Every one of those uncertainties that I listed is a

4    ratchet up, a step upward in the risk that he will face if he is

5    committed to the BOP.

6           That is an extremely unusual situation, and I would

7    submit none of the Government's cases that deal with a present

8    medical situation, and, frankly, even none of ours, properly

9    account for this odd time bomb situation that is inhabiting

10   Mr. Mo.  He has been failed by a medical correctional system

11   once.  He should not be failed again.

12          All I will say about the family circumstance, because

13   I think the Court understands the facts more than I can argue

14   them, is that every single case that the Government cites about

15   family circumstances is a departure case.  It's not 2001

16   anymore.  After 2005, the Court views that through an entirely

17   different lens, and I think enough said.

18          There is a bright-line rule in immigration law about

19   whether something is an aggravated felony.  We'd agree with what

20   the rule is.  But where our understanding, and none of us is an

21   immigration lawyer, is that most of the remedies, if not all of

22   them -- waiver, cancellation, et cetera -- aren't available once

23   you cross that one-year bright-line rule into aggravated felony.

24          So what are the alternatives that this Court has?  We

25   would submit that if the Court is going to give Mr. Mo even a

1  fighting chance to stay in the United States that the Court

2  needs to fashion a sentence with 364 days or less of

3  confinement.  He's got 132 days in, so the Court has 232 days

4  that it could use.  And that includes home confinement, halfway

5  house, whatever.

6        If he needs to see the inside of a prison, then the

7  Court should sentence him to the BOP for three months right in

8  between his screening visits so that way we don't ever have to

9  worry about or rely on the BOP medical system.  The other time

10  could be halfway house time, it could be home confinement time.

11        We would recommend, though, that the Court place him

12  on probation and make those things a condition of probation so

13  that that way, based on what happens with him medically, this

14  Court can manage his punishment going forward rather than

15  letting the BOP do it.

16        And then this Court should impose Draconian community

17  service obligations on him.  The Cai letter, C-a-i, demonstrates

18  that he can do amazing things in the community if he puts his

19  mind to it, so let's make him spend 1500 hours a year for two or

20  three years doing that, and in nights and weekends he could sell

21  whey permeate to -- or buy whey permeate in order to do what DBN

22  needs and he can support his family, but let him put his talent

23  that he did use helping Chinese immigrants re-enter this

24  country, let him use that.

25        And we found a program through which he can do it.

1   Let him use that to reintegrate prisoners back into society and

2   put his talents to work and make him the Government's employee

3   for some significant period of time.

4          That is an unusual combination of sentencing

5   recommendations, I recognize, that we are making in light of

6   this case, but this is in so many ways an unusual case and in so

7   many ways an unusual individual.  He's an unusual individual who

8   we have really come to appreciate and to value and to respect

9   and to want the best for.

10          We're all fighting here, and I'm not going to

11  apologize for the resources that we're fortunate to have.  The

12  Government, although, I think has 73 FBI agents who worked on

13  this case one time or another.  Early on the resource balance

14  was the other way.

15          But I'm not going to apologize for what we bring to

16  this case, and I don't think Mr. Mo should be taxed because

17  other people may not be fortunate to.  The point is we have been

18  able to uncover the essence of who this man is, and the essence

19  of who this man is is not someone who belongs incarcerated with

20  what is, we fear, living inside him.

21          THE COURT:  Thank you, Mr. Weinhardt.

22          Mr. Mo, this is the time in the hearing when you're

23  permitted to say what you might want to say to me or to those

24  that are here to support you today.  You don't have to say

25  anything, but is there anything you would like me to know?

1          THE DEFENDANT:  Yes, I want to say something.

2          THE COURT:  Go ahead.

3          THE DEFENDANT:  Yeah.  I put a lot of effort writing

4   this letter, and now I'm going to read it and let everyone know

5   that I'm really sorry.

6          Dear Honorable Judge Rose:  I'm writing to you, to

7   Your Honor, for the only purpose of admitting my mistakes and in

8   taking full responsibilities without any complaints or excuses.

9          When I was a student in China, I suffered in the 1989

10  protest because I expressed my true feeling and thoughts.  Since

11  then it became my dream to live my -- to live the rest of my

12  life and to raise my family in the United States.  I am deeply

13  sad and ashamed for not showing respect to the country that

14  means so much to me.

15         When I first came to the United States in 1998, I was

16  a young man, bearing the American dream to pursue my education

17  and establish a career through honest effort and hard working.

18  My wife and I have two children who are born in the United

19  States.  J███ is now 16 and S████ 11.  We wanted to build a

20  better life for them with more opportunities for their future.

21         Most important to me was to find security for my

22  family by working hard to establish a career and a good

23  reputation.  Now I have destroyed everything that I wanted; my

24  reputation, job security, and my family's respect.

25         The worst day of my life was the day I got arrested on

1   December 11th, 2013, when almost 20 federal agents came into my

2   house around 6 a.m.  My young children were waked up suddenly in

3   their own bedrooms.  They're dressed in pajamas and saw me,

4   their father, get taken away in handcuffs.

5              THE COURT:  Ms. Mo, you can take some time if you need

6   it.  Just continue whenever you're ready, okay?

7              THE DEFENDANT:  Yes.  I'm ready.

8              The two kids were sleeping and meanwhile frightened.

9   It hurt me badly and hopelessly by seeing the expression on my

10  young son's face as he put a blanket over his head in shame and

11  fear.  I will never forget that.

12             In my mind, the cancer that developed in Des Moines

13  was a punishment for my crime.  I was ashamed when the guards

14  left me no privacy in the ultrasound, CT scan, blood testing,

15  chemotherapy, and doctor rooms.  Now I understand this is all

16  part of the punishment due to the crime.

17             I dreamed about death and constantly worried that my

18  wife would not be able to take on all the responsibility of

19  raising the family by herself because she has a bad health

20  situation.

21             Since my absence from home, my daughter has not been

22  the same.  She was a smart, outgoing girl in good health with

23  many interests, but now she just wants to stay in her room.  She

24  is very sad and afraid.  She is no longer getting along well

25  with her mom, and they engage into arguments quite often and

1  easily.  She doesn't want to eat or go to school.  Her grades

2  kept dropping.

3          And the most scary event is on this August 4th.  She

4  did not eat for full day and fainted out on the floor, hitting a

5  sharp corner while falling down unconsciously and getting her

6  scalp lacerated.  When she waked up and walk to me with blood

7  flowing down on her face and neck, my first impression is that

8  she was trying to kill herself.  I'm extremely sad at seeing her

9  blood shed on the floor, and her change became the most hurting

10 pain in my heart.  I have always been closest to her and trying

11 my best to encourage her and talk to her.

12          I used to play sports activities with my son like

13 basketball and tennis, but when I came back home he only keeps

14 playing chess and not willing to do outdoor activities.  My

15 heart is broken because I know that I am to blame.

16          When I came back home in late 2015, the fruit trees

17 and the flowers in the backyard were dying or died.  It's a bad

18 sign for me.  I put more effort and took good care of them.

19 When the red rose started flowering, it immediately turned on

20 the hope in my mind when my kids first enjoyed the fruits from

21 the mango, avocado, and dragon eye trees in the backyard.  It

22 reminds me how precious to stay at home.

23          The new leaves appeared in backyard trees always

24 brighten my eyes and encourage me to live a meaningful new life.

25 Nowadays the beautiful poems and songs make me into tears

1  easily.  I have learned a lesson and will never put myself in a

2  situation like this again.  I will do everything I can to make

3  up for my wrongdoing.

4          With great respect, Hailong Mo.

5          THE COURT:  Thank you, Mr. Mo.

6          Cases are always difficult.  Sentencings are always

7  difficult, and the day that it becomes easy to take away

8  somebody's liberty should be the day that I retire from the

9  bench.  It should never be an easy decision to make, and it's

10  certainly not in this particular case.

11          This is, perhaps, the most complicated case that's

12  ever come before me as a judge, that I ever had any involvement

13  in during my years of federal investigation and prosecution.  It

14  is an immense case on a lot of levels.  And so we have spent, as

15  we needed to, a whole lot of time in this case talking about all

16  the complexities of it.  We have spent a great deal of time

17  talking with each other and taking evidence about what to do in

18  this particular case, both, you know, prior to trial and after

19  the plea happened and as we were pending sentencing.

20          I have read, you know, the 2500 pages of material that

21  was provided to me by the parties in anticipation of the

22  sentencing, and I read the thousands of pages before that that

23  came before me as part of the litigation of this case.

24          Looking at all those matters, I'm going to make some

25  kind of basic factual findings and note some basic things in the

1   record, and then I'm going to talk about the arguments that have

2   been presented and then how I view those under a 3553(a)

3   analysis.

4           It goes largely without saying, given the complexity

5   of this case, that I have considered all of the factors under

6   3553(a), and I'll talk about them more specifically.  I have

7   considered the advisory guideline range here.  I have considered

8   the statutory penalties.

9           I considered many of those matters when the parties

10  brought to me the original 11(c)(1)(C) plea agreement to 0 to 60

11  months, and I had considered at that time whether that was

12  something I could live with and whether it was something I

13  thought was a fair and reasonable resolution of a very complex

14  matter.

15          Defendant is a Chinese citizen and a lawful permanent

16  resident of the United States.  He was an executive at DBN, an

17  agricultural company in China.  DBN is a large, sophisticated,

18  and very powerful company.  DBN's billionaire chairperson is the

19  defendant's brother-in-law.

20          DBN was identified by the Chinese Government as a

21  National Key Dragon Head Enterprise, which means the company is

22  deemed vital to China's agricultural development and which means

23  DBN receives China's financial and governmental backing.

24          Defendant was DBN's director of international business

25  and was responsible for DBN's operations in North America, and,

1    as Mr. Griess pointed out, became the sole source, really, of

2    foreign corn and agricultural technology back to China.

3            Corn is the largest crop grown in China, and as that

4    country's population is booming, so too is its need for corn.

5    China currently has to rely upon foreign powers to create that

6    corn because their technology lags years and years and years

7    behind the technology in other countries and in particular

8    behind the technology of the United States.

9            Pioneer and Monsanto, without question, have

10   developed, through years of labor and great technology and

11   millions and millions of dollars spent, corn lines that are far

12   superior to anything that China has been able to develop and

13   really served as the world's leaders in corn technology.

14           Against this backdrop, the criminal case in Iowa

15   developed.  And it was one that started, you know, with a man in

16   a field and grew into something, you know, that internationally

17   is an enormous case for both China and the United States.

18           Defendant was tasked by DBN with acquiring highly

19   valuable American corn germplasm for China, whether through

20   legal or illegal means.  And although the defendant had no

21   particular expertise in corn germplasm, he undertook this task

22   that he was given through a variety of methods, starting,

23   arguably legally, by sort of buying corn commercially, although

24   in violation of some of the contract agreements, and then

25   escalating into finding and stealing from the confidential test

1   fields where the inbred parent lines were being grown by Pioneer

2   and Monsanto.

3          We know from the FISA investigation that was done here

4   and by seizures that were accomplished that Defendant was able

5   to send back to China more than a thousand pounds of corn over

6   the course of many years and that this corn was a variety of

7   things.  Some of it was commercially available hybrid corn, some

8   of it was patented corn, some of it was trade secret corn that

9   was either pending or not yet pending patent protection.  But at

10  any rate, Defendant sent back to China enormous amounts of very

11  valuable corn.

12         We know from conversations that were intercepted,

13  although the timing of those Mr. Weinhardt has raised questions

14  about, but we know hundreds of unique corn lines from Pioneer

15  and Monsanto were acquired in this way, and, as Mr. Griess spoke

16  about, this is uniquely complicated or uniquely aggravating for

17  these corn companies because they each have superior technology

18  and they don't share with each other that technology, and

19  suddenly China has been able to take the best of both of those

20  companies' work and put them together.

21         I have found here that the loss here was at least $320

22  million -- or the intended loss, I should say, was at least $320

23  million.  I agree with the Government that is likely a gross

24  underestimate of what the intended loss was.

25         There is certainly evidence that China managed to use

1   seeds that the defendant sent it to grow corn.  There are

2   intercepted conversations talking about how well the corn that

3   they got from America is growing in their fields in China and

4   which particular seed lines are doing well and which ones are

5   not, so we know that this is growing and is in production in

6   China.

7          Now, whether, you know, the early 2010 corn is what's

8   growing or the later stolen 2011 and 2012 or 2013 corn is

9   growing, but we know that China has managed to go in production

10  using technology that America, through Pioneer and Monsanto,

11  developed.

12         We also know a number of things about Mr. Mo.  He is

13  47.  He was born and raised in the Sichuan province of China.

14  He had a loving and supportive childhood.  He is obviously an

15  exceptionally bright man.  He has several degrees, including two

16  doctorate degrees, one in engineering thermophysics and one in

17  mechanical engineering.  He earned one of those in China and he

18  earned the second at Kansas State University.

19         He immigrated to the United States in 1998.  He

20  married in China before he immigrated, and his wife came with

21  him to the United States, and together they have two United

22  States citizen children who were born here.

23         The defendant has always been employed.  There's no

24  question here that he works hard.  What Mr. Weinhardt raised in

25  his arguments about the defendant's loss of his position at the

1   Florida university and how he then turned to DBN is borne out by

2   the employment records that we see.

3          What is clear is that Mr. Mo was earning quite a lot

4   less than DBN offered him and at his highest I think was making

5   $40,000 in annual salary.  DBN took him on and immediately more

6   than doubled that salary, and as he increased his criminal

7   activity, his salary was increased by DBN, and so he ends up

8   making easily three and almost four times what he was making in

9   legitimate research when he's working for DBN.

10          We know also here that in 2014, shortly after his

11   indictment in this case, he was diagnosed with synovial sarcoma,

12   which is a very rare form of cancer.  He has successfully

13   undergone surgical and chemotherapy treatment and is now -- this

14   isn't the medical word they use, but in essence, he's in

15   remission.  In medical terms, since July of 2015, there's no

16   evidence of his cancer.

17          We also know there's a fairly high risk that this

18   cancer will reoccur, and that risk of reoccurrence at the

19   five-year mark -- or the risk is 50 percent reoccurrence within

20   the first five years.  That number drops with each successful

21   year that's passed cancer-free.  Mr. Mo at this point is coming

22   up on his 15-month anniversary cancer-free.

23          Experts recommend that he be screened regularly, and

24   here the top experts in the world, really, at MD Anderson for

25   this particular disease recommend that he be screened every four

1   months for part of that time and every three months for part of

2   that time, so every three months until July of 2017 and then

3   every four months for the next two or three years, and then

4   every six months the remainder of his life.

5           Mr. Weinhardt raised here an issue of the correctional

6   system failing him medically, and I want to touch on that just

7   briefly just to make sure that the public record on that is

8   clear.  Mr. Mo had symptoms of this disease beginning in 2002.

9   He was seen in China in 2013 with symptoms of this disease, and

10  they deemed there to be nothing there of concern.

11          When he was taken into the jail and he was going

12  through medical procedures there, he noted some of these same

13  symptoms.  He told the jail that he had previously had benign

14  types of growths removed from his chest and his arms, and he

15  told them that he had been tested in China earlier that year and

16  that they had deemed there to be nothing wrong with him.

17          He noted the size of this particular growth from

18  China, and when they did testing the size remained consistent

19  here in Iowa.  Understandably, with that background, they did

20  not anticipate that he had this rare form of cancer of which

21  there's less than a thousand diagnosed each year.

22          Now, he went on to privately have surgery that did not

23  do what it should have done, probably, and he went on to get, as

24  he appropriately could, the very best medicine available to him

25  in the world at MD Anderson for this particular condition, and

1   undoubtedly their expertise is what saved his life.

2          But I don't see that as a failure by the correctional

3   system to help him.  I see that as a pretty reasonable treatment

4   analysis that they had undergone or that they underwent when he

5   came to their attention.

6          The defendant's other history is otherwise

7   unremarkable.  He's never had substance abuse problems, he

8   doesn't have other physical problems aside from those related to

9   the cancer.  He has some mental health struggles, which are not

10  unusual given his history of spending time in the United States

11  and of facing incarceration as he does.  He's struggling with

12  depression and anxiety, and that's a pretty common thing we see

13  among defendants.

14         So that's a rather long recitation of what the facts

15  are in this case.  Now I want to tackle some of the arguments

16  the parties have made.  And if I don't touch upon every single

17  argument that's been presented to me in the 200-plus pages of

18  briefing, it's not because I haven't considered it.  I have

19  considered all of them.  I just want to hit upon a handful of

20  them.

21         First, under a 3553(a) analysis, and generically in

22  this case, the first thing I have to do is impose a sentence

23  that reflects the seriousness of the offense and promotes

24  respect for the law and provides just punishment.

25         Frustratingly in this case, to me, when a defendant

1   appears before me and asks essentially for a 100 percent

2   variance, I am looking for certain things.  I am looking for

3   early and timely pleading guilty, I am looking for cooperation,

4   I am looking for making victims whole.  And we have none of

5   those things in this case.

6         Mr. Mo didn't timely plead.  He pled just before trial

7   and after we had litigated 70 -- more than 70 pretrial motions.

8   He didn't proffer.  He's never cooperated.  He's never sat down

9   with the seed companies and told them what he did, told them

10  what fields they trespassed into, told them the seeds they

11  stole, told them who his co-conspirators were, identify for them

12  anybody within the companies that may have helped him.  He's

13  never done that.  He has not repaid for them a single cent of

14  what was stolen from them.

15        And I have to consider that when I decide whether he's

16  somebody who has earned his way to a 100 percent variance.  It

17  would not be fair, in my view, to give him the same sentence I

18  would give someone who had done all of those things.  And

19  effectively, that's the lowest sentence I can give anyone is a

20  sentence of probation.

21        Second, I have to consider deterrence.  This case is

22  undeniably part of a larger trend that is being seen across the

23  United States.  And just like drugs sort of became a scourge

24  across our country, we are seeing in increasing numbers these

25  kinds of trade secret theft cases that are originating from

1   China.

2          I do think it's important, and I do think we have to

3   send a message to China, that this kind of criminal behavior is

4   not going to be tolerated in the United States and that there

5   are serious consequences for the people that they send here or

6   that they recruit here to commit these crimes against our

7   country.

8          Third, I have to think about how to best protect the

9   country against further crimes of this defendant.  Mr. Mo has no

10  criminal history.  He is clearly a decent person who made some

11  very bad mistakes, but I am understandably concerned that he has

12  not even severed his relationship with DBN.  This is the country

13  that sent him here and tasked him with committing this crime,

14  and he still works for them and, according to Mr. Weinhardt's

15  statement, intends to continue working for them even if he were

16  in a probationary setting with me.

17          I know that DBN belongs to his brother-in-law and his

18  sister works there, and I understand that, but I am concerned

19  that, given the fact that he never said no to this company and

20  that he continues to be supported by them emotionally and

21  financially, this kind of crime could reoccur under the right

22  circumstances, and that concerns me.

23          I also want to discuss some of the special interests

24  that arose during the course of this case that relate uniquely

25  to Mr. Mo.

1          First, the idea of Mr. Mo's deportation is one that is

2    very complex.  Ordinarily, I am very sympathetic to people who

3    are in the United States working hard and otherwise not

4    committing crimes.  I hate to see those folks torn out of the

5    United States and tossed back to a country that has very

6    different freedoms than we have here that may be a very

7    dangerous situation for certain people.

8          I am cognizant of the fact that Mr. Mo was one of the

9    students caught up in the Tiananmen Square massacre and that he

10   was punished as a result of his work there, but it is very hard

11   to stomach the idea of supporting somebody remaining in the

12   country who essentially created -- you know, committed espionage

13   against the country.

14         He sat in this country for years stealing from the

15   country, and it is hard to say to that person you should not be

16   deported when he was so badly abusing this country when he was

17   busy sending our very best technology back to China.

18         Second, I can't find here that he should be credited,

19   at least certainly not on a day-to-day basis or -- day-to-day

20   basis, against his term of imprisonment or any term of

21   imprisonment for the pretrial release conditions.  I know they

22   were more onerous than normal conditions would be.  He had a

23   24-hour guard, and, given the medical procedures he was

24   undergoing, that was undoubtedly an invasion of his privacy and

25   a limit on his freedoms.

1          But every morning he could get up when he wanted to,

2    he could take a nap if he wanted to, he could go to bed when he

3    wanted to, he could wear what he wanted to wear, eat what he

4    wanted to eat, watch what he wanted to watch, read what he

5    wanted to read, talk to who he wanted to talk to.  He could go

6    to chess matches, he could go to tennis matches, he could go to

7    church, and he could go to the school events.

8          In short, he could do, really, almost anything he

9    wanted to do, he just had to do it while guards followed him

10   around, and that is very different than those who are

11   incarcerated suffer.  Those who are incarcerated have none of

12   those same freedoms, and they don't get to live with their wife

13   and children.  They don't get to do all of those kinds of

14   things.  So to me this was not the same as detention.

15         Third, I have to consider Mr. Mo's medical conditions

16   and whether or not those warrant a downward variance.  Clearly,

17   there is concern here for Mr. Mo and what may happen to him in

18   the future, but I am confident that BOP can handle his needs, at

19   least those needs that relate to the monitoring of his

20   situation.

21         The doctors who testified have assured me that these

22   are regular blood tests, they are regular CT scans, they are

23   regular chest X-rays that need to be done.  There's no special

24   expertise necessary to do those things.  They've also assured me

25   that Defendant has the right to send those blood results and

1  chest X-rays and CT scans to his very competent experts at MD

2  Anderson.  He can send them those results.  They can read them,

3  and they can decide if something needs to be done.

4         If something needs to be done, I have every reason to

5  believe that BOP would move him into one of those Level IV

6  facilities if he's not already there and take every effort to

7  treat this cancer.  So I certainly am concerned for Mr. Mo and

8  his health, but I also think BOP is capable of handling those

9  needs.

10         I also have considered here the family issues facing

11  the family.  And although I know Mr. Mo has spoken publicly with

12  his children's names and talked about some of the sad

13  circumstances surrounding the struggles with his daughter, I ask

14  that anybody who is here in the media not publish that

15  information about the daughter in particular.  I can't order you

16  not to.  You can.  It happened in a public courtroom.  But I am

17  concerned about what happens to this daughter if that

18  information becomes publicly available.

19         I am very, very sympathetic to the difficulties that

20  this family is undergoing.  However, and this is a very sad

21  fact, but Mr. Griess is exactly right that if we had a forensic

22  psychologist examine every defendant we sentence, probably 95

23  percent of them would have the similar kinds of trauma that's

24  going on in your family.

25         The fact of the matter is crimes and imprisonment

1  cause stress and anxiety and depression and chaos in families,

2  and it's not something our country is dealing with particularly

3  well right now, but it is something that's happening almost

4  everywhere.

5          And the fact of the matter is your family is actually

6  far better off than most of the families we see.  Your family is

7  intact, meaning you've got two good parents.  You're financially

8  secure.  There's no substance abuse problems in your family,

9  there's no sexual abuse, there's no physical abuse.  There's

10 none of those sort of horrors that we see on a depressingly

11 daily basis here in this court.

12         Your daughter is struggling, that's clear, and I hope

13 for the best for her, but in some ways this case actually got

14 her some help she needed because those problems predate by many

15 years your arrest.  And so I'm glad she's getting some help.  I

16 hope she'll continue to get some help.  But ultimately, that is

17 not a situation that is all that different than what I see on a

18 daily basis.

19         Finally, I have to consider in your case the

20 11(c)(1)(C) that was entered into here.  This is an agreement

21 that the Government reached with you, I think appropriately, to

22 a sentence that's already less than half of what you would

23 otherwise have been -- or would have received under an advisory

24 guideline range.

25         And in my view, having been the judge assigned to all

1    of this during the pretrial litigation, the Government didn't

2    offer you that plea agreement because they had a weak case.  It

3    wasn't one of those situations where the Government was worried

4    about getting a conviction.  It certainly appears to me they

5    offered you that plea agreement because of the enormous

6    resources that would have gone into trying this case.

7              So I have to consider that you've already received --

8    by way of allowing you to plead to just one count with a

9    ten-year maximum and then agreeing that your sentence should be

10   no more than 60 months, that you've already received a

11   significant benefit here in the plea bargain that was struck.

12             So putting all of those things together and coming to

13   a sentence in your case is not an easy one.  I have debated more

14   hours than I could count what to do in this case, and that

15   analysis has shifted as I've heard the different arguments of

16   the parties and the evidence that's been presented and read all

17   of the materials.  And less than many other cases, I am not sure

18   that I'm going to get it entirely right.  I'm not sure there is

19   a good or right answer in this case.

20             I think I could sentence you to 60 months'

21   imprisonment and have that be an appropriate sentence.  I think

22   I could sentence you to nine months' imprisonment and have that

23   be an appropriate thing and anywhere in between.  It's been

24   trying to balance and swinging back and forth between those

25   kinds of numbers that I've been doing over the past period of

1  days and weeks.

2          But ultimately, what I think the appropriate sentence

3  in your case is is 36 months' imprisonment, and that is what I'm

4  going to impose.  This is a sentence that is two years lower

5  than I would otherwise have given because of the medical

6  conditions that exist here with you.

7          If you were a healthy man who had never suffered this

8  rare form of cancer, I would have imposed a five-year sentence

9  in this case, and that is because of the very serious nature of

10  the crime that was committed and my need, as I've said, to

11  recognize the deterrence that has to be brought to bear here.

12          Following that term of imprisonment, I will order a

13  three-year term of supervised release.  You will have to comply

14  with all the standard conditions of supervision.  In addition,

15  you'll have some special conditions of supervision that relate

16  to your particular and individual needs.  Those include

17  surrendering to immigration if you are ultimately -- they decide

18  they're taking action against you for deportation.

19          I am not going to impose a fine, and I'll find that

20  you don't have the ability to pay a fine in light of the

21  restitution that we know is coming.  That restitution that had

22  been requested was, you know, well in excess of a half a million

23  dollars and even if it's reduced by a significant amount will

24  still be quite high in this case.

25          We will handle the restitution issues at a later date,

1  but because, undoubtedly, there will be at least some

2  restitution ordered in this case, I am going to impose what are

3  our standard financial conditions, meaning that you can't

4  solicit or incur or apply for any further debt, including but

5  not limited to loans, lines of credit, or credit cards, either

6  as a principal or co-signer, as an individual or through any

7  corporate entity, without first obtaining written permission

8  from the probation office until that restitution has been paid.

9          You shall provide complete access to financial

10  information, including disclosure of all business and personal

11  finances, to the probation office, again, until the restitution

12  has been paid.

13          And you'll have what is a standard search condition in

14  our district, meaning that the probation office has my

15  permission to search you or your car, your house or any business

16  that you might have, if they have a good reason to believe

17  you're failing to comply with the law or that you're violating

18  one of the terms and conditions of supervision.

19          If they conduct that kind of a search, they have to do

20  it in a reasonable way and in a reasonable manner at a

21  reasonable time.  They can bring the marshals with them if they

22  need to for their security or for yours.

23          If things are going well, they're not going to invade

24  your privacy in that way, but if they show up to visit you and

25  there's brand new cars sitting in the parking lot or there's,

 1  you know, brand new computer equipment sitting inside that they

 2  don't know anything about, then they're probably going to be

 3  suspicious that there's financial issues they need to delve

 4  into.

 5       I order forfeiture as set forth in previous

 6  preliminary orders of forfeiture in this case.  There is no

 7  other forfeiture other than what's been briefed by the parties

 8  and presented through pleadings to the Court.

 9       I do order that you pay the $100 special assessment

10  that is mandatory in this case.

11       The last thing I want to talk to you about today is

12  your right to appeal.  Now, you have waived most of your rights

13  to appeal pursuant to your plea agreement.  I have imposed a

14  sentence that was consistent with that plea agreement, but visit

15  with your lawyers about what appeal rights you have left.

16       If you decide you want to appeal, you just need to let

17  them know, and they'll file that notice of appeal for you.  And

18  they'll handle, I assume, any appeal on your behalf.  If for

19  some reason your lawyers are no longer willing to work with you

20  past the point of appeal, then if you qualify for an attorney,

21  we will appoint one to represent you and to handle that appeal.

22       Now, if you want to appeal, even if the plea agreement

23  prohibits it, they'll still file the protected paperwork for

24  you, and that will go forward under certain unique appeal

25  grounds.

1             Mr. Griess, I think we have Count 2 to be dismissed.

2             MR. GRIESS:  Correct, Your Honor.

3             THE COURT:  Count 2 will be dismissed.

4             Mr. Beck and Mr. Walczweski, I don't know whether I'll

5 see you back here for our restitution hearing.  If I do, I'll

6 look forward to it.  If not, I doubt that you'll have occasion

7 to come back to Iowa in the future, but it was nice working with

8 you and nice to get to know you.

9             Is there anything else, Ms. Dietch, that we need to

10 clarify as part of the judgment?

11             THE PROBATION OFFICER:  No, Your Honor.

12             THE COURT:  Mr. Griess?

13             MR. GRIESS:  No, Your Honor.

14             THE COURT:  Mr. Weinhardt and team?

15             MR. WEINHARDT:  Three things, Your Honor.  First, we

16 are informed that for designation purposes, which we've

17 discussed a lot in this case, it's very important that Mr. Mo's

18 medical records accompany the presentence report and be made

19 part of it, and so we would ask that the exhibits not to the

20 supplemental -- well, I have to enumerate these.  The Trent

21 letter, the Araujo letter, but then all of Group Exhibit 2 to

22 the original sentencing brief and Exhibit 3, which was the

23 summary of those records, we would ask that all of those be

24 appended to the presentence report.

25             THE COURT:  Okay.  We will --

1          MR. WEINHARDT:  I can send the Court an e-mail this

2   afternoon that itemizes for sure what exhibits we want appended,

3   but that's what we would ask.

4          THE COURT:  We can figure out how to do that and will

5   do that.  I also am going to order as part of the sentencing

6   judgment unusually strong language about getting these tests

7   done.  In fact, I am going to order -- and if you want to help

8   draft some language and send it to me by e-mail, we'll get it

9   into the J & C, but essentially directing the BOP to conduct

10  these tests on the schedule that's been provided.  And if you

11  want to give me the exact schedule of when, which months and

12  years those are due.

13         MR. WEINHARDT:  We can do that.  And then also just

14  regarding facility recommendation, we would like to caucus

15  internally a little bit about that, but first and foremost, we

16  want a recommendation away from the private institutions where

17  foreign nationals usually go, but we may have some particular

18  language that we want about a particular institution.

19         THE COURT:  And that would be fine.  You can get me

20  that material as well.  We'll want to get the J & C on file by

21  tomorrow, but you can send me that information today or early

22  tomorrow morning.

23         I am also going to direct, unless -- Mr. Griess, do

24  you have any position with respect to self-surrender?

25         MR. GRIESS:  I leave that to the Court's discretion,

1  Your Honor.

2           THE COURT:  This is an appropriate case, given the

3  medical issues, in my view, for self-surrender.  I'm going to

4  order that self-surrender not occur any sooner than 90 days from

5  now so we have time to do the restitution hearing and get things

6  finalized, and if we need to bump that back to do some other

7  things, we can, but no sooner than 90 days is what I'm looking

8  at.

9           If you have particular facilities, I can put that

10  language.  Of course, those are recommendations, but there are

11  certain ways I can write that that makes it more recommended

12  than others --

13           MR. WEINHARDT:  We would appreciate that.

14           THE COURT:  -- for lack of better terminology there.

15           MR. WEINHARDT:  That covers all of my issues, Your

16  Honor.

17           THE COURT:  Okay.  Mr. Mo, you are somebody I've had a

18  chance to get to know through all of these cases.  I really do

19  wish you the very best of luck.  I really do hope for your

20  family that things improve and continue to get better for you.

21           I know you've said that you destroyed everything in

22  your life.  I don't think you have.  You certainly hit a bump in

23  the road, but you are still a young man and you still have an

24  incredible brain and you still have a good family.  You can put

25  this back together.  It's just going to take some work.  But you

1  haven't lost everything.  You just learned a really harsh

2  lesson.

3          THE DEFENDANT:  Thank you, Your Honor.

4          THE COURT:  Good luck to you.

5          We are adjourned.

6          (Proceedings concluded at 2:37 p.m.)

1               C E R T I F I C A T E

2          I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 26th day of October,

12   2016.

13

14

15                          /s/ Kelli M. Mulcahy
                            Kelli M. Mulcahy, CSR, RMR, CRR
16                          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25